Scott Martin (*Pro Hac Vice*)
Kyle G. Bates (SBN 299114)
Yixi "Cecilia" Cheng (SBN 325216)
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com
kbates@hausfeld.com
ccheng@hausfeld.com

Byung-Joo Lee (SBN 225384)
JIHYANG LAW FIRM
Seohee Tower, 7/F
2583 Nambusunhwan-ro
Seoul, Korea 06735
Telephone: 82-2-3476-6002
Facsimile: 82-2-3476-6607
bjlee@jihyanglaw.com

YoungKi Rhee *(Pro Hac Vice)*
WE THE PEOPLE LAW GROUP
Chingyang Building, 7/F
47Kyonggidae-ro, Seodaemun-gu
Seoul, South Korea 03752
Telephone: 82-2-2285-0062
ykrhee@wethepeople.co.kr

*Additional Counsel Listed In Signature Block*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Korean Publishers Association, Korea Electronic Publishing Association, PangSky Co., Ltd., and OverX Co., Ltd. *on behalf of themselves and all others similarly situated,*<br><br>        Plaintiffs<br><br>v.<br><br>Google LLC, Google Ireland Ltd., Google Asia Pacific Pte. Ltd., and Google Commerce Ltd.<br><br>        Defendants | Case No. 3:25-cv-4686-JD<br><br>**JURY TRIAL DEMANDED**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT** |

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................ - 1 -

II.  JURISDICTION AND VENUE .......................................................... - 4 -

III.  PARTIES ............................................................................................ - 6 -

   A.  Plaintiffs ...................................................................................... - 6 -

   B.  Defendants ................................................................................... - 8 -

IV.  CLASS ALLEGATIONS .................................................................... - 9 -

V.  RELEVANT FACTS ......................................................................... - 13 -

   A.  The Market for Licensable Smart Mobile OSs .......................... - 13 -

   B.  The Google Play Store and Developer Distribution Agreement ...... - 16 -

   C.  Google Enters Anticompetitive Contracts with OEMs to Maintain Google Play's Dominance in the Android App Distribution Market ........................ - 17 -

   D.  Google is a Monopolist in the Market for Android App Distribution ......... - 25 -

   E.  Google Engages in Unlawful Behavior in Order to Restrain Trade and Maintain and Grow its Monopoly in the Markets for Android App Distribution and In-App Payment Processing ................................................................................ - 28 -

      1.  Google Designs and Implements Technical Barriers ............................. - 28 -

      2.  Google Has, at Times, Shut Down Existing Consumers' Access to Competitive Stores ................................................................................................ - 34 -

      3.  Google Deters Competitive Entry Through Financial Incentives Provided to Certain App Developers ............................................................................... - 35 -

   F.  Google Monopolizes Android In-App Payment Processing and Ties it to Android App Distribution ............................................................................................. - 36 -

      1.  The In-App Payment Processing Market is a Relevant Antitrust Market............. - 36 -

      2.  Google has Unlawfully Tied the Google Play Store to Google Play's Billing ..... - 37 -

      3.  Where Google Allows Alternative Billing Methods, it Imposes Restrictions and High Commissions that Enforce its Anticompetitive Tie and Foreclose Competition .. - 39 -

   G.  Google's Conduct Harms Developers and Competition ................................. - 40 -

VI.  THE SMALL APP DEVELOPER SETTLEMENT ........................................ - 43 -

VII.  STANDING ...................................................................................... - 44 -

VIII.  RELEVANT MARKETS ................................................................... - 45 -

   A.  First Relevant Product and Geographic Market ...................................... - 45 -

   B.  Second Relevant Product and Geographic Market ................................... - 47 -

IX.  GOOGLE HAS CONTINUOUSLY VIOLATED THE ANTITRUST LAWS .......... - 48 -

X.  CLAIMS FOR RELIEF ...................................................................... - 51 -

Plaintiffs Korean Publishers Association, Korea Electronic Publishing Association, PangSky Co., Ltd., and OverX Co., Ltd. (collectively "Plaintiffs"), on behalf of themselves and Classes of similarly situated developers of Android application(s) and/or in-app digital goods or services, including subscriptions offered for sale at a non-zero price, bring this Second Amended Class Action Complaint for damages and equitable relief against Defendant Google LLC and its subsidiaries for violations of Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§ 1, 2, 3), California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq*.) ("UCL"), the California Cartwright Act (Cal. Bus. & Prof. Code §§ 16700, *et seq*.), Korea's Monopoly Regulation & Fair Trade Act (Act No. 20239) ("MRFTA"), Japan's Act on Prohibition of Private Monopolization and Maintenance of Fair Trade (Act No. 54) ("Antimonopoly Act" or "AMA"), and Japan's Civil Code (Act No. 89). All allegations herein, other than those concerning Plaintiffs, are based on information and belief.

## I.    INTRODUCTION

1.    More than 2.5 billion people worldwide use the Google Play Store every month. App developers create the apps and in-app products that consumers use and enjoy daily on phones using the Android mobile operating system ("OS"). Android has been available on mobile devices since 2008 and has been the most dominant mobile OS since 2011. Today, Android OS accounts for over 70% of the mobile OS market.

2.    Google LLC and its subsidiaries Google Ireland Ltd. ("Google Ireland"), Google Asia Pacific Pte. Ltd. ("Google Asia"), and Google Commerce Ltd. ("Google Commerce") (collectively "Google") have unlawfully monopolized the global markets, excluding China, for Android app distribution and in-app payment processing, which together comprise the conditions under which Android app developers place their products and services for distribution, as well as the method by which purchases are made. Rather than fairly compensating the app developers who are the lifeblood of the Google Play Store, also called Google Play, Google extracts an anticompetitive 30% headline tariff on apps and in-app products that Google had no part in creating or developing.

3.    Google has and continues to systematically leverage anticompetitive agreements and technical barriers to secure its monopoly and block potential competition in the mobile OS market

and global markets, excluding China, for Android app distribution and in-app payment processing. Google has done so in multiple ways

4.    *First*, Google obtained and maintains its monopoly status through agreements with original equipment manufacturers ("OEMs")—*i.e.*, smartphone makers—for use of its OS. The key agreements in this respect are Google's Mobile Application Distribution Agreement ("MADA"), RSA 3.0, and Project Banyan and its successor agreements. Pursuant to MADA, OEMs must preinstall the Google Play Store and must, in addition, give it premium placement through a permanent position on the device's home screen. Pursuant to RSA 3.0, OEMs who elect to enter into the Premier Tier of the RSA 3.0 agreement must agree not to preinstall any app store other than the Google Play Store on their devices. And pursuant to Project Banyan and its successor agreements, Samsung and Google agreed that Samsung's Galaxy Store would not compete with the Google Play Store in exchange for Samsung receiving a revenue share of Google's monopoly revenues.

5.    The only other dominant mobile operating system is the iOS created by Apple Inc. ("Apple"), which has ~28% of the OS market compared to Android's ~72%. But because the apps and add-ons for Android devices and iOS devices are incompatible (with all the barriers and switching costs entailed), Apple's App Store does not place any material competitive pressure on the Google Play Store.

6.    *Second,* Google deploys unnecessary and pretextual technical barriers to deter consumers from downloading app stores and apps directly from the web (often referred to as "sideloading"). These barriers include: (1) default settings to effectively block sideloading; (2) misleading official Android security warnings; and (3) other security mechanisms designed to deter consumers from using a competing app store or downloading apps from outside the Google Play Store. Google also prevents the automatic updating of apps downloaded outside of the Google Play Store and, through its security systems, sometimes disables such apps without a user's knowledge. Google's pretextual technical barriers create "significant friction for sideloading apps to Android devices . . . [S]ideloading entails a complicated twenty-step process, and users encounter multiple security warnings designed to discourage sideloading."

7.    *Third*, Google requires all Android app developers to enter into its adhesive suite of agreements, including the Google Play Developer Distribution Agreement (the "DDA"), which, *inter alia*, specify Google's ability to extract supracompetitive commission rates, prohibit the use of in-app payment processing services other than Google Play Billing, and ties the use of the Google Play Store to the use of Google Play Billing.

8.    *Fourth*, Google enters into anticompetitive agreements with large app developers. As the prospect of Epic Games' move away from the Google Play Store became evident, Google launched an initiative called "Project Hug", now referred to as the Games Velocity Program. As part of that project, Google entered into revenue sharing agreements ("RSA") with large app developers who were frustrated with its monopoly rates. Project Hug aimed to find a monopoly commission rate that was higher than the competitive rate, but low enough to forestall true price competition.

9.    Until recently, Google has forced developers to process payments for in-app purchases exclusively through Google's billing system—at a cost of 30% on each transaction, or 15% on the first $1 million of annual revenue that a developer generates through the Google Play Store.

10.    By stifling competition, Google deprives consumers of alternative choices in the global markets, excluding China, for Android app distribution and in-app payment processing, and, as a result, it is able to command an anticompetitive commission of up to 30% on transactions made through the Google Play Store and Google Play Billing.

11.    In July 2021, a proposed class action was filed on behalf of U.S.-based Android app developers seeking injunctive and monetary relief related to Google's conduct in Android app distribution and in-app payment processing. In June 2022, a settlement was reached in that class action for $90 million on behalf of a settlement class defined, in relevant part, as U.S.-based Android app developers with earnings from the Google Play Store of $2 million or less per year (the "Small App Developer Settlement").

12.    In December 2023, the jury in *In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD (N.D. Cal.) ("*In re Google Play*") concluded that Google (1) unlawfully acquired or maintained monopoly power in the worldwide, excluding China, markets for Android app distribution

1    and Android in-app billing services for digital goods and services transactions; (2) unreasonably

2    restrained trade in the worldwide, excluding China, markets for Android app distribution and Android

3    in-app billing services for digital goods and services transactions; and (3) unlawfully tied the use of

4    the Google Play Store to the use of Google Play Billing.

5        13.    When forced to compete in a properly-functioning market, Google charged developers

6    significantly less than Google's current rates. On the Chrome Web Store, for example, where Google

7    faced competition from various distribution channels, and thus cannot charge arbitrary

8    anticompetitive rates, Google charged just 5%. Epic Games ("Epic"), as another example, charges a

9    12% service fee on the Epic Games Store. Other entities have suggested that processing payment

10   transactions would be profitable for less than 10%. In the United States, millions and millions of

11   credit card transactions are processed for a range of 1.5% to 3.5% every day.

12       14.    Even when litigation and regulatory pressure have forced Google to allow alternative

13   billing methods in certain jurisdictions including the Republic of Korea ("Korea"), India, the

14   European Economic Area ("EEA"), and the U.S., Google has imposed restrictions to foreclose

15   competition. For example, Google still collects a supracompetitive fee of 26% or 27% even when

16   consumers opt to use a third-party payment provider, which makes switching to an alternative

17   payment provider financially prohibitive.

18       15.    But for Google's exclusionary behavior, competition in the Android app distribution

19   market, as well as the tied market for in-app payment processing, would have eroded Google's

20   monopoly power and constrained its ability to impose supracompetitive prices.

21       16.    Plaintiffs and members of the proposed classes are Android app developers that were

22   forced to pay anticompetitive commissions to Google and abide by its anticompetitive policies.

23   **II.    JURISDICTION AND VENUE**

24       17.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§

25   1331, 1332(a)(2), 1337(a), and 1367.

26       18.    This Court also has supplemental jurisdiction over Plaintiffs' California law claims,

27   Korean law claims, and Japanese law claims pursuant to 28 U.S.C. § 1367(a).

28

19.    This Court has general personal jurisdiction over Google because Google has its principal place of business in Mountain View, California, and because it has stipulated to personal jurisdiction in California.

20.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1)-(2) and (d) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district, because Google resides in this District, and because of Google's contacts with this District.

21.    Google has also agreed, as a condition of its DDAs with developers, that venue for disputes like the instant case is proper in this District.

22.    With regard to Plaintiffs' claims arising from sales of Android apps and in-app products to U.S.-based consumers, California and U.S. Federal law apply by virtue of the choice-of-law provision in Google's DDA, which states, "[y]ou and Google further agree to submit to the exclusive jurisdiction of the federal or state courts located within the county of Santa Clara, California to resolve any legal matter arising from or relating to this Agreement or Your relationship with Google under this Agreement."[1] Furthermore, a substantial part of the conduct at issue took place in California—where Google maintains its U.S. headquarters—including meetings and communications through which Google developed, implemented, and enforced its anticompetitive scheme. California has a clear, substantial, legitimate, and compelling interest in applying its law to corporate citizen Google's unlawful conduct that emanated from within California's borders.

23.    With regard to Korean Publishers Association ("KPA"), Korea Electronic Publishing Association ("KEPA"), and PangSky Co., Ltd.'s ("PangSky") claims arising from Korean-based Android app developers' sales of Android apps and in-app products to consumers anywhere in the world other than China, this Court may properly apply Korean law because numerous Korean courts have held that they cannot resolve disputes between a Korean domiciliary and U.S. domiciliary where the parties contractually agreed to resolve their disputes in California pursuant to forum selection and

---

[1] *Google Play Developer Distribution Agreement*, Google LLC (Feb. 5, 2024), https://play.google/developer-distribution-agreement.html.

choice of law clauses that designate this District and California law as the forum and law to be applied.[2]

24.     With regard to OverX Co., Ltd.'s ("OverX") claims on behalf of itself, the Japanese Law Class, and the Japanese App Developer Class (defined below), this Court may properly apply Japanese law because Japanese courts have held that they could not resolve disputes between a Japanese domiciliary and Apple or Google where the parties contractually agreed to resolve their disputes in California pursuant to a forum selection clause that designates this District as the appropriate forum.[3]

## III.     PARTIES

### A.     Plaintiffs

25.     **KPA** is an association that represents Korean publishers. KPA was established on March 15, 1947 and joined the International Publishers Association in 1957. Among its members are app developers that distribute Android apps through the Google Play Store, including paid apps, and apps offering in-app purchases. These members have been injured by Google's conduct as alleged herein and will continue to be so injured until such time as Google ceases its anticompetitive conduct. KPA's Android-developer members are parties to Google's DDA and associated policies and guidelines.

26.     KPA is Korea's oldest and largest private-sector organization that covers all facets of the publishing industry. It was established to protect the freedom of publication and promote the public interest through projects, research, and education for the promotion of the publishing industry. It aims to contribute to the sustainable development of the publishing industry and to advancements of knowledge and culture. It conducts business necessary to promote the publishing industry, improve

---

[2] *See, e.g.*, Seoul Central District Court decision 2018gahab506082, September 18, 2019; Korean Supreme Court decision 2020da238424, October 15, 2020; Seoul Central District Court decision 2019gadan5162753, October 20, 2020; Korean Supreme Court decision m2017da219232, April 13, 2023; *Google Play Developer Distribution Agreement*, Google LLC (Feb. 5, 2024), https://play.google/developer-distribution-agreement.html.

[3] *See, e.g.*, Tokyo District Court September 8, 2015 (東京地判平成 27 年 9 月 8 日，事件番号平 26（ワ）1590 号，Westlaw JAPAN 文献番号 2015 WLJPCA 09088006, D1-Law.com 判例体系 判例 ID 29013863) 東京高等裁判所 2009年6月18日 判決.

1    publishing ethics and establish sound distribution order, promote international exchange of the

2    publishing industry, and expand the overseas publishing market.

3        27.    KPA is active in the various sectors of education, research, policy development,

4    festivals, copyright exchange, and more to advance the publishing industry and defend the freedom

5    to publish. It also conducts mail order business, education services, stationery retail, market research

6    and public opinion research for the publishing industry, and other projects necessary to accomplish

7    its goals.

8        28.    KPA has been at the forefront of entities urging legislative action against Google and

9    Apple's unlawful restraints in Korea.

10        29.    **KEPA** is an association composed of electronic publishing businesses. It was founded

11    in 1992 and consists of 55 members. Since 1992, KEPA has been supporting the country's e-content

12    publishing activities through education, publishing support, and certification programs. Among its

13    members are app developers that distribute Android apps through the Google Play Store, including

14    paid apps, and apps offering in-app purchases. These members have been injured by Google's conduct

15    as alleged herein and will continue to be so injured until such time as Google ceases its

16    anticompetitive conduct. KEPA's Android-developer members are parties to Google's DDA and

17    associated policies and guidelines.

18        30.    KEPA's purpose is to promote and further contribute to the development of the

19    information society. Its mission is to actively support the production and active distribution of diverse

20    and abundant electronic publishing content to further consolidate the foundation of cooperation

21    between publishers, distributors, and technology companies.

22        31.    To pursue its goals, KEPA collects information, conducts research, holds

23    presentations, and promotes joint development and high-tech dissemination. It also promotes

24    standardization, hosts exhibitions, offers training and education, promotes industry-academic

25    cooperation, enhances distribution, proposes public policy changes, and conducts other projects

26    necessary to achieve its goals.

27

28

32.     KEPA has been at the forefront of entities urging legislative action against Google and Apple's unlawful restraints in Korea.

33.     **PangSky** is a Korean company with its principal place of business in Seoul, Korea. PangSky develops Android apps that it offers for distribution on the Google Play Store, such as the game app Jewel Fairy Island. Though Jewel Fairy Island is free to download, the app offers in-app purchases. Jewel Fairy Island has been downloaded more than 50,000 times worldwide on the Google Play Store.

34.     During the Class Periods, Plaintiff PangSky sold Android apps and/or in-app products to customers in the United States and elsewhere around the world. PangSky is a party to Google's DDA, and policies and guidelines referenced in this Complaint.

35.     **OverX** is a Japanese company with its principal place of business in Tokyo, Japan. OverX develops multiple Android mobile gaming apps, including (1) Ice Cream, Now!, which allows players to set up and manage ice cream shops, create ice cream flavors and decorative cakes, and serve their creation to game characters; and (2) Santa Factory, in which players operate a Santa factory and create Christmas gifts. Although Ice Cream, Now! and Santa Factory are free to download, they offer in-app purchases.

36.     During the relevant Class Periods, Plaintiff OverX sold in-app products to customers in the United States, Japan, and elsewhere around the world. OverX is a party to Google's DDA, and guidelines referenced in this Complaint.

37.     Throughout the relevant Class Periods, Plaintiffs PangSky, OverX, and individual members of KPA and KEPA paid Google supracompetitive commissions—up to thirty percent (30%)—on all purchases and payments related to their Android apps and were damaged thereby.

**B.     Defendants**

38.     Defendant Google LLC is a Delaware limited liability company with its headquarters and principal place of business in Mountain View, California. It is the owner of the Google Play Store, from and by which developers of Android apps sell paid applications, music, movies, books, and in-app products to Android device owners.

39.    Upon information and belief, and as alleged, Google took all decisions and actions complained of herein at its corporate headquarters in Mountain View, California, or elsewhere in the state of California. It is believed, and therefore alleged, that substantially all of the misconduct alleged in this Complaint occurred in, or emanated from, California.

40.    Defendant Google Ireland Ltd. ("Google Ireland") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC. Google Ireland contracts with app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this Complaint.

41.    Defendant Google Asia Pacific Pte. Ltd. ("Google Asia") is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and is a subsidiary of Google LLC. Google Asia contracts with app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this Complaint.

42.    Defendant Google Commerce Limited ("Google Commerce") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC. Google Commerce contracts with Korean-based app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this Complaint.

## IV.    CLASS ALLEGATIONS

43.    Plaintiffs bring this action for equitable relief and damages on behalf of themselves and classes of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

### **App Developer Class**

44.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), Plaintiffs KEPA, KPA, PangSky, and OverX bring this action seeking damages on behalf of themselves and a putative Class of Android App Developers ("App Developer Class") defined as follows:

1
2
3

> All persons or entities that sold Android Apps (including subscriptions and in-app products) inside the Google Play Store to purchasers located in the United States from June 3, 2021 and until such time as the effects of Google's anticompetitive conduct end to the extent that the person or entity has not released their claims in connection with the Small App Developer Settlement.

4

## Korean Law Class

5

45.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), Plaintiffs

6    KPA, KEPA, and PangSky bring this action on behalf of themselves and a putative class of Android

7    App Developers ("Korean Law Class") defined as follows

8
9

> All persons or entities that sold Android Apps (including subscriptions and in-app products) inside Google's Korean Play Store storefront from September 24, 2015 and until such time as the effects of Google's anticompetitive conduct end.

10

## Korean App Developer Class

11

46.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), Plaintiffs

12    KPA, KEPA, and PangSky bring this action on behalf of themselves and Android App Developers

13    domiciled in Korea ("Korean App Developer Class") defined as follows:

14

15
16

> All persons or entities domiciled in Korea that sold Android Apps (including subscriptions and in-app products) inside the Google Play Store to purchasers located anywhere in the world except China between June 3, 2015 and until such time as the effects of Google's anticompetitive conduct end.

17

## Japanese Law Class

18

47.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), Plaintiff

19    OverX brings this action seeking damages and injunctive relief on behalf of itself and a putative class

20    of Android App Developers ("Japanese Law Class") defined as follows:

21

22
23

> All persons or entities that sold Android Apps (including subscriptions and in-app products) inside Google's Japanese Play Store storefront from September 23, 2008 and until such time as the effects of Google's anticompetitive conduct end.

24

## Japanese App Developer Class

25

48.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), Plaintiff

26    OverX brings this action seeking damages and injunctive relief on behalf of itself and a putative class

27
28

of Android App Developers domiciled in Japan ("Japanese App Developer Class") defined as follows:

> All persons or entities domiciled in Japan that sold Android Apps (including subscriptions and in-app products) inside the Google Play Store to purchasers located anywhere in the world except China between September 23, 2008 and until such time as the effects of Google's anticompetitive conduct end.[4]

49.     Excluded from the Classes are the following persons or entities: (a) Defendants; (b) Defendants' parent companies, subsidiaries, and affiliates; (c) Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) the judge and chambers staff assigned to this case, as well as the members of their immediate families; and (e) all jurors assigned to this case.

50.     Plaintiffs KPA and KEPA bring their claims pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) only.

51.     Plaintiffs reserve the right to expand, change, or modify the class definitions based upon discovery and further investigation.

52.     *Numerosity.* Plaintiffs do not know the exact number of Class members. Plaintiffs are informed and believe that, due to the nature of the trade and commerce involved, the Classes are so numerous and geographically dispersed that joinder of all members of each of the Classes in the prosecution of this action is impracticable.

53.     *Typicality.* Plaintiffs' claims are typical of the claims of their fellow Class members because Plaintiffs sold Android Apps through the Google Play Store during the Class Periods. Plaintiffs and all members of the Classes were damaged in the same manner by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Classes.

54.     *Commonality.* Google has acted on grounds generally applicable to the Classes, thereby making final damages and equitable relief appropriate with respect to the Class as a whole.

---

[4] The App Developer Class, Korean Law Class, Korean App Developer Class, Japanese Law Class, and Japanese App Developer Class are referred to hereinafter as the "Classes."

Moreover, numerous questions of law or fact common to the Classes—including, but not limited to, those identified below—arise from Defendants' anticompetitive and unlawful conduct:

(a)    Whether there is a global market (excluding China) for Android app distribution;

(b)    Whether there is a global market (excluding China) for Android in-app payment processing services;

(c)    Whether Google unlawfully monopolized the global market (excluding China) for Android app distribution;

(d)    Whether Google unlawfully monopolized the global market (excluding China) for Android in-app payment processing services;

(e)    Whether Google's conduct, as alleged herein, violated the Sherman Act;

(f)    Whether Google's conduct, as alleged herein, violated California's UCL;

(g)    Whether Google's conduct, as alleged herein, violated the California Cartwright Act;

(h)    Whether Google's conduct, as alleged herein, violated Korea's Monopoly Regulation & Fair Trade Act;

(i)    Whether Google's conduct, as alleged herein, violated the AMA and Japan's Civil Code;

(j)    The duration of Google's anticompetitive or illegal conduct;

(k)    Whether Plaintiffs and the other members of the Classes were injured by Google's conduct and, if so, the determination of the appropriate measure of damages for each of the Classes; and

(l)    Whether Plaintiff and other members of the Classes are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

55.    ***Predominance.*** These and other questions of law and fact are common to the Classes and predominate over any questions affecting the members of each Class individually.

56.    ***Adequacy.*** Plaintiffs will fairly and adequately represent the interests of each of the respective Classes because they sold Android Apps through the Google Play Store during the relevant

1    class periods and have no conflicts with any other members of the Classes. Furthermore, Plaintiffs

2    have retained sophisticated and competent counsel who are experienced in prosecuting antitrust class

3    actions, as well as other complex litigation.

4        57.    ***Superiority.*** This class action is superior to other alternatives for the fair and efficient

5    adjudication of this controversy. Prosecuting the claims pleaded herein as class actions will eliminate

6    the possibility of repetitive litigation. There will be no material difficulty in the management of this

7    action as a class action. Moreover, the prosecution of separate actions by individual members of the

8    Classes would create the risk of inconsistent or varying adjudications, establishing incompatible

9    standards of conduct for Defendants.

10    **V.    RELEVANT FACTS**

11        58.    Google has injured Plaintiffs, the proposed Classes, and competition by way of its

12    unlawful behavior in the global markets, excluding China, for Android app distribution and Android

13    in-app payment processing of digital content on mobile devices utilizing the Android OS for

14    smartphones, including but not limited to subscriptions. As the holder of an unlawfully obtained

15    monopoly in these markets, Google overcharges developers in app transactions taking place in the

16    Google Play Store by imposing a supracompetitive service fee on each paid app and on sales of in-

17    app digital products through Google Play's billing system. Google's conduct has inhibited the

18    emergence of vibrant—and viable—competing app stores and payment processors, reinforcing its

19    monopoly power.

20    **A.    The Market for Licensable Smart Mobile OSs**

21        59.    Like desktop and laptop computers, smart mobile devices require an operating system,

22    also called an OS, which is a software product that controls the basic functions of the device. Without

23    an operating system, the user cannot operate the device or run other software. OSs designed for smart

24    mobile devices are "smart mobile OSs."

25        60.    In addition to the features typically found in a desktop or laptop computer OS, smart

26    mobile OSs include features such as a touchscreen, cellular, Bluetooth, and Wi-Fi capabilities, GPS

27

28

mobile navigation, cameras, video cameras, speech recognition capability, voice recorders, music players, personal digital assistants and other features.

61.     Licensable smart mobile OSs constitute a distinct product market. Although desktop and laptop computers, early mobile phones (like flip phones) and game consoles also use operating systems, those operating systems are not compatible with smart mobile devices and are not included in the relevant market.

62.     As the House Subcommittee on Antitrust, Commercial and Administrative Law found in 2020, Google has "durable and persistent market power" in this "mobile operating system market." This was not a groundbreaking conclusion. Following a years-long investigation, the European Commission ("EC" or "Commission") concluded in a July 18, 2018, decision that Google abused its dominant power in the Android app distribution market.

63.     The EC concluded that Apple's iOS "exercises an insufficient indirect constraint on Google's dominant position in the worldwide (excluding China) market for licensable smart mobile OSs," confirming that Apple's iOS should not be included in the relevant market for licensable smart mobile OSs.

64.     Google did not contest the Commission's conclusion that smart mobile OSs constitute a distinct product market.

65.     Device manufacturers, also called original equipment manufacturers or OEMs, preinstall smart mobile OSs on devices before selling them to retailers and end users. Most device manufacturers do not develop their own OSs but instead license Google's Android OS. The most widely used mobile non-Android OS outside of China is Apple's iOS. But because Apple manufactures its own smart phones and tablets and does not license its operating system to device manufacturers, Apple's iOS is not an option for device manufacturers, and thus does not present a competitive restraint on Android's licensable smart mobile OS.

66.     Google has monopoly power in the market for licensable smart mobile OSs. This monopoly power is demonstrated by Google's market share, the existence of high barriers to entry

1  and expansion, the lack of countervailing buyer power, and the lack of constraint posed by non-

2  licensable smart mobile OSs like Apple's iOS.

3      67.    The EC found that, excluding China, Android OS is installed on more than 95% of

4  smart mobile devices with licensed mobile OSs worldwide. There also has been very little competitor

5  entry, while at the same time "once-competitive mobile operating systems like Nokia, BlackBerry,

6  and Microsoft struggled to survive as Apple and Google grew more dominant, eventually exiting the

7  marketplace altogether." The only other licensable smart mobile OSs that have entered the market

8  since 2011 have not made a material dent in Google's market share. The most prominent competitor—

9  Microsoft—dropped below 2% market share in 2016 and exited the market shortly thereafter. The

10  other providers, including Firefox OS, Linux, and Sailfish, have been unable to gain more than 0.2%

11  market share. As the House Subcommittee reported, "[i]ndustry experts have testified before the

12  Subcommittee that the 'reality is that it would be very difficult for a new mobile phone operating

13  system today' to compete with Apple and Google, 'even if it offered better features.'"

14      68.    The market for licensable smart mobile OSs is characterized by high barriers to entry

15  and expansion. First, development of a smart mobile OS requires an enormous investment of time

16  and money in research and development. Google says, for example, that it subsidized the development

17  of Android through advertising revenue derived from Google Search and Chrome.

18      69.    Further, "there is significant inertia in the choice of operating system and smartphone

19  brand." High switching costs deter most consumers from switching between operating systems when

20  they seek to upgrade their mobile devices.

21      70.    There are significant monetary and non-monetary switching costs associated with

22  moving from the Android ecosystem to another platform, including the actual or potential loss of data

23  such as contacts, pictures, and apps (including time, money, and effort invested within the app

24  environment); financial costs; opportunity costs; social costs; procedural costs; and psychological

25  costs.

26      71.    As the House Subcommittee on Antitrust, Commercial and Administrative Law found

27  in 2020, "[i]n the smartphone market, switching costs include learning a new operating system, which

28

can discourage users from leaving Google or Apple due to familiarity with their distinct operating systems, as well as the inability to easily port all of their data, such as messages, call history, and photos."

72.    Even in cases where users can download apps from sources other than the Google Play Store, Google restricts the features these apps are able to provide. For example, the non-Google Play Store versions of some popular apps cannot be integrated with wearable devices or Android Auto, while their counterparts in the Google Play Store have these capabilities.

73.    Google's behavior has consequences for consumers: one study by Korea's Consumer Protection Agency found that the price difference for in-app purchases from the *same* app—with the only difference being the app store it was originally downloaded from—could be up to 59% higher for apps downloaded from the Google Play Store.

74.    A 2021 study found that 90% of Android smartphone purchases in the U.S. are made by consumers whose previous smartphone was an Android. By comparison, the percentage of U.S. consumers intending to switch brands the next time they purchase a vehicle is 54%.

**B.    The Google Play Store and Developer Distribution Agreement**

75.    Google introduced its app store, then known as Android Market, in or about September 2008. Within weeks, Google, HTC, and T-Mobile released the first Android OS smartphone, the TMobile G-1. This Android OS smartphone came pre-loaded with the Android Market (the predecessor to the Google Play Store).

76.    On or about March 6, 2012, Google introduced its Google Play Store, which both succeeded and subsumed its predecessor, Android Market, adding digitized music and books to the store's offerings. It now carries movies and television programs as well.

77.    In order to sell products through the Google Play Store, app developers must enter into a suite of agreements with Google, including Google's DDA. The developer then uploads its product to Google servers for compliance review, testing, limited release (if any), and production-release for sale to consumers in the store.

78.    The DDA notes that Google will "display and make [developers'] Products available for viewing, download, and purchase by users" in the Google Play Store in exchange for a "'Service Fee', as set forth [in another document] and as may be revised by Google from time to time with notice to Developer . . . charged on the sales price and apportioned to the Payment Processer and, if one exists, the Authorized Provider."

79.    The DDA also states that "[i]n order for [developers] to charge a fee for [developers'] Products and to be paid for Products distributed via Google Play," developers must have an agreement with Google's payment processor and pay a "Service Fee . . . charged on the sales price."

80.    Developers sell their apps and in-app digital content directly through the Google Play Store (for apps) and Google Play's billing (for in-app digital content). Consumers select apps from the displays that Google organizes and sets up; tender payments to Google; and download apps from the Google Play Store to their devices.

81.    Google withholds a "service fee" of up to 30% on each paid sale of an app and most in-app digital products.

**C.    Google Enters Anticompetitive Contracts with OEMs to Maintain Google Play's Dominance in the Android App Distribution Market**

82.    Google obtained and maintains monopoly power in the global market, excluding China, for Android app distribution through, in part, interlocking types of contractual agreements with device manufacturers: (1) the Android Compatibility program, formerly called the Anti-Fragmentation Agreements and Android Compatibility Commitments, which generally prohibit "forking" (*i.e.*, making or distributing versions of Android not compliant with Google's technical standards); (2) MADAs which grant access to key Google apps and critical application program interfaces ("APIs"); and (3) revenue sharing agreements, also called Mobile Incentive Agreements, which allow device manufacturers to share in Google's revenue in exchange for abiding by various restrictions in favor of Google.

83.    Under the Mobile Incentive Agreements, Google shares its search ad revenue in exchange for device manufacturers' agreement to use Google search as the sole preset search service

on a list of "search access points" and, under certain Mobile Incentive Agreements, to forego preinstalling rival general search services and comply with certain "incentive implementation requirements."

84.     Google uses its MADAs to secure default premium placement for the Google Play Store on the home screen of Android devices. Making the Google Play Store the default app store on Android devices gives a significant advantage to Google because users rarely change their default settings.

85.     Because Google's MADAs also require that device manufacturers: (1) preinstall a suite of Google proprietary apps; (2) prevent consumers from deleting or removing many of these Google apps; and (3) provide Google's apps with preferential placement on the device's home screen, Google effectively crowds out competing apps and app stores.

86.     Moreover, device manufacturers must agree under MADA and related Anti-Forking Agreements that their devices will pass the Android Compatibility Test, which Google administers and controls in its sole discretion. This further reinforces Google's restraint on the production of devices using Android forks as their operating systems, which in turn restricts avenues for distribution of competing app stores and apps.

87.     Further, in 2019, Google began a program it refers to as RSA 3.0, which is a set of agreements that Google entered into with Android OEMs. As part of the RSA 3.0 agreements, Google paid OEMs who elect their devices into that program a revenue share. The program involved different tiers, with each higher tier requiring more obligations from OEMs as compared to a lower tier, with the upshot for OEMs of receiving a higher revenue share for entering into higher tiers. The highest tier was referred to as the "Premier Tier." In order to qualify for the RSA 3.0 Premier Tier, OEMs had to agree not to preinstall any app store on their smartphone other than the Google Play Store. RSA 3.0 is the third iteration of revenue sharing agreements Google has historically had with OEMs.

88.     The result of RSA 3.0 was that the Google Play Store enjoyed exclusivity for all devices enrolled in the Premier Tier "out of the box." Google's internal documents note that RSA 3.0 was meant "to protect Google from key strategic risks." As Google noted, "Android dynamics have

1    changed and Google has had higher exposure of search-and-play revenue than before." Google's

2    witness confirmed at trial in *In re Google Play*, this meant the "risk of loss of revenue." Google also

3    proclaimed that RSA 3.0 "protects against Play risks with OEMs complimenting [Projects] Hug and

4    Banyan."

5          89.    These agreements are explicitly linked. A device manufacturer can enter MADA and

6    receive access to key Google apps and critical application program interfaces only if it first enters the

7    Android Compatibility program. Similarly, a device manufacturer can enter an RSA or Mobile

8    Incentive Agreement only if it first enters a MADA.

9          90.    Google's logic is simple: what makes a mobile device marketable is its apps. Google

10   has developed several popular apps, including YouTube, Google Maps, Gmail, and the Google Play

11   Store, that are not open source. Any device manufacturer seeking access to those key apps must obtain

12   a license, which is available only to device manufacturers that agree (pursuant to MADA and license

13   agreements) to preinstall these Google apps on their Android OS devices. Indeed, for devices sold in

14   the U.S., these Google apps are bundled as a suite, so device manufacturers that want to license one

15   app must preinstall them all. Google touts this program as Google Mobile Services ("GMS"):

16
17               The best of Google, right on your devices Google Mobile Services
        brings Google's most popular apps and APIs to your Android devices.
18               Google's most popular apps, all in one place Google Mobile Services
        (GMS) is a collection of Google applications and APIs that help
19               support functionality across devices. These apps work together
        seamlessly to ensure your device provides a great user experience right
20               out of the box.

21         91.    Google Mobile Services is a crucial element of Google's domination of the Android

22   ecosystem. Indeed, the Google Mobile Services restrictions "have strictly limited—if not excluded—

23   third-party apps from being preinstalled. In this way, Google's licensing agreements not only preclude

24   the vast majority of third-party apps from being preinstalled, but they also funnel those apps into the

25   Google Play Store, subject to Google's commissions and arbitrarily enforced policies."

26         92.    One important condition for access to Google Mobile Services is that manufacturers

27   agree to comply with so-called compatibility requirements set forth in the Android Compatibility

28   program. As Google puts it, "[w]e ask GMS partners to pass a simple compatibility test and adhere

1  to our compatibility requirements for their Android devices. In turn, your users enjoy greater app

2  reliability and continuity."

3       93.    Ostensibly, Google seeks compatibility to help assure that software works across a

4  variety of devices. But Google has gone further than merely requiring compatibility testing for devices

5  on which manufacturers wish to install the Google Mobile Services suite. As part of its strategy to

6  maintain as much dominance over the Android ecosystem as possible, Google refuses (as a condition

7  of its MADAs) to license Google Mobile Services to manufacturers who develop "Android forks"—

8  variants of the official Android OS published by Google. As the EC put it with respect to the record

9  antitrust fine it imposed on Google in 2018:

> Google has prevented device manufacturers from using any alternative
> version of Android that was not approved by Google (Android forks).
> In order to be able to pre-install on their devices Google's proprietary
> apps, including the Play Store and Google Search, manufacturers had
> to commit not to develop or sell even a single device running on an
> Android fork. The Commission found that this conduct was abusive as
> of 2011, which is the date Google became dominant in the market for
> app stores for the Android mobile operating system.

15      94.    Manufacturers that want access to Google Mobile Services are prohibited by way of

16  the Android Compatibility program from building even a single device based on Amazon's Android

17  OS fork, known as Fire OS. According to the EC, this resulted in even Amazon being denied a way

18  to distribute its own Android OS app store.

19      95.    There is no justifiable basis for Google's restraints with regard to Android forks. As

20  the European antitrust authorities found, Google's stated aim—to help ensure that software works

21  across various Android OS devices—does not require or justify the restraints on competition that

22  Google forces upon OEMs:

> The Commission also assessed in detail Google's arguments that these
> restrictions were necessary to prevent a "fragmentation" of the Android
> ecosystem, and concluded that these were not well founded. First,
> Google could have ensured that Android devices using Google
> proprietary apps and services were compliant with Google's technical
> requirements, without preventing the emergence of Android forks.
> Second, Google did not provide any credible evidence that Android
> forks would be affected by technical failures or fail to support apps.

28

96.     Google further exercises control over Android app distribution by bundling the Google Play Store with Google Play Services, a proprietary software layer that runs in the background on Android. It provides application programming interfaces that enable apps to integrate with other apps and with Google services. Many of these Google services are critical to the functioning of apps. Without Google Play Services, for example, apps cannot provide crucial functionalities like displaying "push notifications" or pinpointing a user's location on a map—thus rendering them, in many cases, commercially irrelevant. As another example, more than half of the apps in the Google Play Store use Google's cloud messaging service; nearly half use AdMob, Google's mobile advertising service. As of December 2023, Google's AdMob was used in 90.19% of Android apps that used an ad network software development kit. Apps cannot access these functionalities without Google Play Services. As the EC concluded, without Google Play Services, "many apps would either crash, or lack important functions."

97.     Google does not license the Google Play Store and Google Play Services separately. They can only be licensed together, thus further entrenching Google Play's dominance to the exclusion of competitors.

98.     As for Samsung, Google has a different approach. Google and Samsung have historically enjoyed a relationship akin to partners rather than competitors. In 2018, Samsung agreed to distribute Epic Games' popular game Fortnite on the Galaxy Store, even though Epic was not offering the game on the Play Store. Google immediately responded and Samsung relented. Indeed, within hours of learning that the Galaxy Store would host the Fortnite launcher, Jamie Rosenberg, former Vice President of Strategy and Operations for Platform and Ecosystems at Google, sent urgent messages to his Samsung contacts to voice his concern that Samsung would allow Fortnite to be distributed outside the Play Store without the attendant, Google-manufactured Unknown sources frictions. Samsung's representative apologetically responded that this "was done by the service team without my knowledge" and that he would immediately "look[ ] into it." Rosenberg then made sure that "Samsung knew that Google was not happy with what they did with Epic" and obtained

"assurances from Samsung that exclusive game launches would not be a part of their core strategy going forward."

99.     In 2019, following Fortnite's launch on the Galaxy Store, Google initiated Project Banyan. At the time, Google recognized that "Samsung is the only OEM with sufficient share to plausibly build its own store in key Play markets." An explicit goal of Project Banyan was "to have a single voice to the ecosystem, and so that the [Google and Samsung] teams were not out competing with each other." In Samsung's words, Google was "basically asking [Samsung] to get out of the store business."

100.     Samsung was receptive to Google's non-compete proposals and in June of 2019 sent Google a term sheet with a counter-offer. In the term sheet counter-offer, Samsung stated that the goal of the deal was to "[p]revent unnecessary competition" between the Galaxy store and Google Play, and to "[s]top distributing 3rd Party app/game installer via Galaxy Store." Ultimately, no written agreement was signed.

101.     In internal discussions of Project Banyan, Sameer Samat, head of Android and the Play Store at Google, noted that "[a]ssuming we did not do a deal with Samsung for their store, we should think about how to compete." Jamie Rosenberg responded:

> [t]he one risk I continue to worry about is the scenario in which Samsung comes out with a very public and disruptive rev[enue] share model (i.e., it just decides that it will only take 5% and use its app store for purposes of building [forms of payments] and user profiles and differentiating devices). […] [i]f Samsung wins the hearts and minds of developers on this, it could create enormous pressure on us to unblock their opportunity one way or the other.

Mr. Rosenberg wanted to ward off that hypothetical threat, recognizing that an agreement with Samsung would only make sense if Google and Samsung could "achieve structural alignment on business model." In other words, Google wanted to "secure confidence that [Samsung] won't drive down [its revenue share to] 5 [percent]." However, Google understood that what it could explicitly put in an agreement to "secure confidence" that Samsung would not compete is "subject to lots of legal advice on what 'securing confidence' can mean."

102.    While Google and Samsung did not eventually execute a written agreement terminating all competition between their respective app stores, in 2020, Google and Samsung did sign an RSA promising Samsung billions of dollars from Google Search revenues flowing from Samsung devices. During those negotiations, Google proposed to Samsung that they "more and more . . . start acting as one unit to the market." And following that 2020 RSA deal, Samsung indeed has not competed with the Play Store: Samsung has not entered into any exclusive deals with any major game developers to launch titles on the Galaxy Store; Samsung continues to have an extremely small share of app downloads; and Samsung continues to charge developers the same 30% revenue share that Google charges, and has never lowered that headline rate, as Rosenberg feared it might do.

103.    What's more, within weeks of Google entering into a proposed settlement with a coalition of 53 attorneys general and consumer plaintiffs (the "State Settlement") that partially constrains the frictions Google previously imposed through the Unknown sources install flow, Samsung announced the release of a new feature called Auto Blocker. The Auto Blocker feature, characterized by Samsung as an enhanced security option, was made available for users to opt into as part of the then-current version of Samsung's One UI. One UI is Samsung's proprietary user interface layer, which Samsung installs on top of Android on all Samsung phones.

104.    On July 11, 2024, Samsung announced that beginning with the next version of One UI, version 6.1.1, "[t]he default setting for Auto Blocker is set to On in the phone's initial setup wizard."

105.    When Auto Blocker is set to "on," it disables the installation of apps from any and all sources other than the Play Store and the Samsung Galaxy Store; these are the only sources Auto Blocker deems "authorized sources" for apps, to the exclusion of all other stores as well as direct downloading of apps from the web. Samsung does not offer an avenue for third-party store operators, such as Epic, to qualify their stores as "authorized sources," irrespective of the safety and security of these third-party stores.

106.    If a user does attempt to install an app from an "unauthorized" source, they are presented with a pop-up alert, and Auto Blocker prevents the user from continuing with the installation.

## Unknown app blocked

To keep your phone and data safe, Auto Blocker prevents the installation of unknown apps. You can only install apps from authorised sources such as the Play Store or Galaxy Store.

To remove this protection, go to Settings > Security and privacy > Auto Blocker.

## OK

107.    This prompt is misleading in at least the following ways: First, the prompt states installation would be allowed from authorized sources "such as" the Play Store and the Galaxy Store, suggesting these two stores are mere examples of authorized sources, when in fact these two stores are the only "authorized" sources; no other source is or can be recognized by Auto Blocker as authorized. Second, the pop-up alert invariably states that the relevant app is an "unknown app," even if the app is in fact well known to Samsung, Google, or both. For example, Auto Blocker would block the installation of Fortnite from the Epic Games Store, even though Fortnite was available on the Galaxy Store for years. The same would be true for any other app, no matter how reputable its developer might be: Call of Duty, Photoshop, Instagram, Kindle, Word, Spotify and Netflix—all would be deemed "unknown apps" by Auto Blocker should they be distributed directly or through any third-party store, even though the very same apps are not deemed unknown if distributed through the Play Store or the Galaxy Store.

108.    If a user wants to disable Auto Blocker, they must navigate through three different screens. First, they must go into Settings. Second, they must go into security and privacy. Third, they must go into the Auto Blocker menu. When the user is in the Auto Blocker menu, the settings present

1   the user with a scare screen stating that Auto Blocker "keeps [their] phone safe by blocking threats

2   and other suspicious activity" even though Auto Blocker conducts no assessment of the safety or

3   security of any specific source or any specific app before blocking an installation.

4       109.    In October 2023, Samsung's press release announcing the introduction of Auto

5   Blocker stated: "[t]here are many benefits to intentional sideloading, such as enhanced customization

6   and control over a device's functionality. Those who love to safely sideload will experience no change

7   as the feature is off by default." A month later, Google was deemed an illegal monopolist, and by July

8   2024, it became abundantly clear that Google itself would be enjoined from continuing to impede

9   competing stores, and so its partner, Samsung, took on the responsibility of maintaining Google's

10  monopoly. Despite the District Court's stated intent to open the Android app distribution market to

11  competition, Auto Blocker will entrench the Play Store as the *de facto* exclusive source of Android

12  apps on all Samsung smartphones.

13  **D.    Google is a Monopolist in the Market for Android App Distribution**

14      110.    Through its contracts and technological barriers, Google has obtained and maintains a

15  monopoly in the global market, excluding China, for Android app distribution. That monopoly power

16  is demonstrated by Google's overwhelming market share, the existence of high barriers to entry, and

17  expansion, and Google's ability to withhold supracompetitive service fees (of up to 30%) from app

18  developers for all transactions.

19      111.    While Google resists publicly disclosing its share of the global market for Android

20  app distribution—going so far as to tell its employees not to "define markets or estimate market

21  shares"—its share of that market can be inferred from the number of devices sold with Google Play

22  Store preinstalled.

23      112.    Google's market share is also demonstrated by the number of apps downloaded from

24  the Play Store—113 billion in 2023—and by the sheer number of apps available on it. Simply put, no

25  other app store can reach as many Android users as the Google Play Store. This is by design. As a

26  result of Google requiring device manufacturers to preinstall the Google Play Store, among other

27  things, Google ensures that most Android apps are downloaded via the Google Play Store.

28

113.    According to the EC, "Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices." According to the trial testimony of Epic Games's expert, Google's market share is "over 80 percent" in the Android app distribution market. And according to Google's own documents, in 2017, "Play accounts for ~75% of all app and games downloads." By any of these measures, Google has monopoly power in the Android app distribution market.

114.    Because of their small shares of the user base, other existing Android app stores cannot discipline Google's exercise of monopoly power in the Android app distribution market.

115.    Google's monopoly power allows it to demand a supracompetitive service fee from developers. As David Heinemeir Hansson ("Hansson"), Chief Technology Officer ("CTO") and Cofounder of Basecamp, a small internet software company, testified before Congress, businesses should not be required to "hand over 30% of their revenue for the privilege" of selling software through the Google Play Store; "[m]ost mobsters would not be so brazen as to ask for such an exorbitant cut." Hansson contrasted Google's cut to the fees his company pays to transact in the credit card processing market. "[W]e basically pay around 2% . . . and there are countless competitors constantly trying to win our business by offering lower rates . . . Mobile application stores are not a competitive market, and the rates show."

116.    In the absence of Google's entrenched monopoly, rivals could establish app stores that would compete, among other dimensions, on price. The Chief Executive Officer of Epic Games, for example, has suggested that they could run a store with as little as an 8% cut while remaining profitable. Epic Games has now introduced an app store with commissions set at 12%. Paddle, an app payment processor, said that it charges an average of 6-7%. And Google itself noted that its break-even cost for payment processing is 6%.

117.    A limited number of device-manufacturer app stores are present on Android smartphones running Google Mobile Services, including the Samsung Galaxy store. But those app stores are device manufacturer-specific—*e.g.*, the Galaxy store is on Samsung devices only—and they do not competitively constrain Google's monopoly. Not only are these stores, at most, available only on a given device manufacturer's smartphones, but they are disadvantaged by the premium

placement that they are contractually required to provide to the Google Play Store and other Google apps.

118.    On the other hand, on personal computers, app distribution is competitive. Consumers download applications from a variety of sources, including the app developer's website or stores on websites such as Amazon, Apple, Microsoft Corporation ("Microsoft"), Google, or Steam. As a result, commissions are often lower, and there is meaningful price and service competition among major distribution channels. For example, Steam charges lower commission rates for higher revenue apps, Microsoft charges lower commission rates for non-game apps (15%) and game apps (12%), and Epic charges 12% for transactions on the Epic Games Store.

119.    There are significant barriers to entry and expansion in the market for Android app distribution. A potential market entrant must: (1) build and maintain the app store client, (2) program and maintain the requisite software and algorithms going forward, (3) advertise the client and the steps needed to install it, (4) keep the marketplace safe, and (5) process payments at a high volume. The cost of all this is prohibitive, particularly given the established position of the Google Play Store. For example, Amazon's app store has barely made a dent in Google's market share, despite Amazon's dedication of hundreds of employees and tens of millions of dollars spent annually over several years to develop and commercialize the store.

120.    The EC has also concluded that there are high barriers to entering the global market for Android app distribution. It found that "there are high barriers to entry in part due to network effects: the more users use a smart mobile operating system, the more developers write apps for that system – which in turn attracts more users. Furthermore, significant resources are required to develop a successful licensable smart mobile operating system."

121.    Other significant barriers to entry and expansion have been erected by Google, which has excluded competition through its restrictive contracts with OEMs and developers, and (addressed below) through its security warnings and threats to end users.

E.     **Google Engages in Unlawful Behavior in Order to Restrain Trade and Maintain and Grow its Monopoly in the Markets for Android App Distribution and In-App Payment Processing**

1.     **Google Designs and Implements Technical Barriers**

122.     Google designed and implemented a variety of technical barriers to keep competing app stores and apps off Android devices.

123.     A device user seeking to install a third-party app store faces significant technical hurdles. For example, Amazon operates an app store for Android apps, but there is no simple or intuitive way for the typical owner of a device using Android to download apps from Amazon's app store. Because of Google's anticompetitive practices, an Android user seeking to purchase an app from the Amazon app store must first sideload the store—which requires locating the store online, figuring out and completing the sideloading process, and changing a security setting on the Android device (a practice that Google warns the consumer "may be harmful to your device and personal data").

**Google's Barriers Fit Together**

124.     Despite touting that its system allows consumers to directly download applications, Google programmed the Android OS so that, as its default setting, it would block users from loading alternative app stores—requiring consumers to navigate through multiple misleading warnings that label even reputable app stores as "Unknown sources."

125.     As its primary technical barrier, Google restricts users from downloading competitive app stores and apps by using: (1) a default setting on the vast majority of Android devices that blocks such downloading, and (2) a permission process to bypass those defaults that display misleading warnings (about the competing store or app being an "Unknown source") and forces users to agree that they are responsible for any resulting damage to their devices.

**Google's Default Setting Prevents Sideloading of Competitive App Stores**

126.    As a foundational barrier, Google created a default setting blocking sideloading on Android OS phones. The vast majority of Android phones are set to this default, blocking consumers from downloading alternative stores or apps via sideloading.

127.    In some instances, Google presents a user trying to sideload an app with: (a) only the option to "Cancel" or go to the device "Settings" menu—with no indication that installation is in fact possible through the "Settings" menu—and (b) with an ominous list of dangers posed by the app, including that it may "send and view SMS messages" which "may cost you money," and "modify or delete the contents of your SD card":



128.    Thus, in addition to all of the steps a user must complete to acquire an app outside the Google Play Store, a user is by default blocked from downloading the so called "unknown apps."

**Friction from multistep permission process and misleading warnings**

129.    Even once consumers decide to try to download a competing store, they must navigate a multi-step process with ominous and misleading "Unknown sources" warnings.

1       130.    The following is an example of the steps that an Android user must take to download

2  an app through an app store other than the Google Play Store. This example, using Amazon's app

3  store, assumes that the user knows about the alternative store and is sufficiently patient, and tech

4  savvy, to try.

5       131.    First, the user must enable the installation of "Unknown sources," and accept this

6  warning: "Installing from unknown sources may be harmful to your device and personal data. By

7  tapping OK, you agree that you are solely responsible for any damage to your device or loss of data

8  that may result from using these applications."

9

10

11

12

13   

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

132.    Second, the user must search Amazon's website on their web browser to find and obtain a link to Amazon's app store:





133.    Then the user must tap on the Download button to download a .apk file of the app store. Once the download is complete, the user must swipe down from the top of the screen to open their notifications view, then tap the Amazon Appstore entry to start the installation:



134.     Because of Google's refusal to allow competitors to distribute app stores via the Google Play Store, and because of Android's security features (controlled by Google), the user had to be willing to turn on the "Unknown sources" permission referenced in step 1 above.

135.     As Donn Morrill, Amazon's Director of Amazon Content and Apps Developer Relations, testified in the *In re Google Play* trial, only 11 percent of users who tried to download the Amazon Appstore through the "Unknown sources" install flow actually succeeded.

136.     As a factual matter, Google's warnings grossly exaggerate the risk of sideloading. The data does not support the claim that third-party stores, particularly those operated by large developers or device manufacturers, are a significant source of malware. For example, an independent study of Android app stores published in 2017 ranked Aptoide as the safest among the Android app stores analyzed and safer than the Google Play Store. But in 2018, the Google Play Store flagged Aptoide as harmful without explaining why Aptoide was marked unsafe, hid Aptoide in users' Android devices, and requested them to uninstall it. Aptoide's CEO revealed that it lost about 15-20% of its user base after Google's acts. And, of course, the Google Play Store itself is vulnerable to malware, scams, and junk apps that could harm users' devices.

137.     Google could readily implement alternative measures to ensure security, without creating onerous obstacles for sideloading and without banning alternative app stores in the Google Play Store. But instead, Google issues its warnings indiscriminately and with the knowledge that it hampers competitors. Like the Google Play Store, the Amazon Appstore is monitored and curated.

138.     Furthermore, Google touts its security measures, including initiatives to safety-check and even quarantine or delete *all* apps on Android devices, wherever they are obtained. For example, in its January 2020 white paper titled, "Android Enterprise Security White Paper," Google stated:

> Google Play Protect is a powerful threat detection service that actively monitors a device to protect it, its data, and apps from malware. The always-on service is built into all devices that have Google Play, protecting more than 2.5 billion devices.
>
> The Google Play Protect Verify Apps service scans devices once everyday for harmful behavior or security risks. If it detects an app containing malware, it notifies the user. Google Play Protect may also remove or disable malicious apps automatically as part of its prevention initiative and use the information it gathers to improve the detection of

Potentially Harmful Applications (PHAs). In addition, the user can opt
to have unknown apps sent to Google for analysis.

139.    Thus, Google already monitors the security of all apps that would be obtained from any competing app store.

140.    Similarly, Google blocks competing app distribution channels by preventing app developers from advertising these channels through Google's marketing properties. This requirement unreasonably raises the cost of customer acquisition for competing app distribution channels, as they cannot reach consumers through widely used forms of advertising that are uniquely effective in reaching users who are immediately prepared to acquire an app but instead must find alternative means of advertising to reach users.

141.    Google's App Campaigns program allows developers to promote apps through ad placements on key online advertising channels, including Google Search, YouTube, Discover on Google Search, and the Google Display Network. These placements are optimized for the advertising of mobile apps and have proven successful. According to Google, one out of every four users discovers an app through a search engine. And because Google Search is the overwhelmingly dominant search engine worldwide, it is a vital channel for app developers to reach customers. Ads on Google's YouTube are likewise a key means for developers to reach consumers.

142.    Since late 2017, Google has forced all marketers to relinquish their control over app ad targeting to fully automated "black box" machine learning tools, which have been criticized for penalizing smaller budget advertisers. But within the Android ecosystem, the crucial App Campaigns program is limited to app developers who list their app in the Google Play Store. Android app developers must list their apps in the Google Play Store if they want to reach consumers through the vital channel of Google advertising.

143.    Even if a user overcomes Google's obstacles to sideloading a competing app store or app, the user faces additional difficulties in keeping the sideloaded app or app store up to date. This is because Google prevents sideloaded apps and app stores from updating in the background. Instead, users who sideload apps or app stores must manually approve every update via a multistep process. Amazon's website describes that process: "1. Open the app store you used to install the app on your

1    device. 2. Search for the app and open the app's detail page. 3. If an update is available, an Update

2    option displays." This multi-step process for updates further discourages consumers from using

3    alternatives to the Google Play Store.

4         144.    Denying competing apps and app stores the ability to auto update or advertise on

5    Google properties erects significant additional barriers to entry. The net effect of this conduct is to

6    harm consumers, including by depriving them of choice in how to download their desired apps and

7    app stores.

8         145.    Google only recently announced that it will allow third-party companies to

9    automatically update sideloaded apps for four years, due to private antitrust enforcement, not

10   competition. This is one of the concessions that Google had to make as part of the proposed State

11   Settlement to resolve its anticompetitive practices.

12        **2.    Google Has, at Times, Shut Down Existing Consumers' Access to Competitive**

13        **Stores**

14        146.    If all else fails—if a consumer learns of another app store, figures out how to acquire

15   the client, educates herself on how to install it, and ignores Google's manipulative security

16   warnings—Google may still attempt to shut down the consumer's access.

17        147.    Not satisfied with denying Aptoide's access to the Google Play Store, Google forced

18   app store operator Aptoide to go to court to successfully seek an antitrust injunction for uninstalling

19   it from Android devices during its Google Play Protect sweeps.

20        148.    Reports indicate that Samsung's apps and its Galaxy store were also caught up in

21   Google's dubious security net. As androidsage.com reported on June 18, 2018, "since today, a bunch

22   of Samsung users have reported of Google Play Store flagging the official Samsung Galaxy App Store

23   as potentially dangerous and fake at the extent of even blocking it." Similarly, as reported by

24   9to5google.com on October 23, 2023, "[o]ver the past several days, that's been the case with Samsung

25   Messages and Samsung Wallet, both of which have been falsely flagged as 'harmful' by Google."

26

27

28

1

2

3.    **Google Deters Competitive Entry Through Financial Incentives Provided to Certain App Developers**

3       149.    Similarly, in order to dissuade large app developers from complaining about Google's

4    monopoly rates or move away from the Google Play Store and Google Play's billing, thereby forcing

5    Google to compete, Google agreed to share a small share of its monopoly revenues with certain app

6    developers. Following Epic Games launching Fortnite off the Google Play Store, Google launched

7    an initiative called "Project Hug," now referred to as the Games Velocity Program. As explained by

8    Google internal documents, Google sought to address the risk of "increased competition . . . risk of

9    top developer churn" and "pressure on Play's revenue share." At the time, Google was aware, and

10   noted, that app developers believed "Google's 30% cut of Play Store app sales is nothing short of

11   highway robbery."

12      150.    Google's plan was to enter into secret deals with the top app developers in order to

13   prevent them from defecting from Google Play and inspiring the widespread "contagion" effect that

14   Google feared. Per the trial testimony of Google's witness in *In re Google Play*, the developers that

15   Project Hug targeted "had either been a vocal agitator about the fee or had asked for ways to explore

16   potential opportunities for changes to the Google Play business model."

17      151.    A Project Hug presentation prepared for senior executives notes that "Fortnite would

18   have been substantially more successful had they launched on Play", but "other developers might

19   follow Epic's path for various reasons." One of those reasons was that "[d]evelopers can afford to

20   take a ~20% performance hit on Epic store (due to 88% rev share) and still break-even. Or a ~30%

21   hit in performance if they decide to go-it-alone." The Business Council approved Project Hug as part

22   of a package with Project Banyan and, by December 2020, Google had signed deals with the vast

23   majority of the developers it targeted.

24      152.    Despite the financial incentives offered to these large app developers by Google, they

25   still paid more in commissions than they would have in a world free of Google's competitive

26   restraints. These developers' decisions to accept Google's financial incentives were tainted by the

27

28

1  anticompetitive marketplace in which they operated, including a fear of retaliation by Google on

2  whom they were and remain dependent for the profitable operation of their businesses.

3  **F.    Google Monopolizes Android In-App Payment Processing and Ties it to Android App**

4  **Distribution**

5  153.    In addition to imposing a supracompetitive service fee for Android app distribution,

6  Google forces developers to use Google's billing product, also known as Google Play Billing or

7  Google Play's billing system, for all in-app digital content purchases. In doing so, Google illegally

8  ties in-app payment processing to its distribution services, which allowed it to monopolize the market

9  for Android in-app payment processing.

10  **1.    The In-App Payment Processing Market is a Relevant Antitrust Market**

11  154.    Payment processing consists of software employed by merchants that perform the

12  necessary steps to verify and accept (or decline) a customer's purchase (or attempted purchase).

13  Payment processing frequently provides additional customer-facing functionalities such as invoicing,

14  payment history, and refund processing.

15  155.    The ability to make quick, seamless purchases within an app itself is critical to the

16  consumer's experience and to the likelihood of purchase. If a consumer was required to purchase in-

17  app digital content only outside the mobile app, that user might simply abandon the purchase or stop

18  interacting with the app altogether. And in-app purchases are critical to developers: the revenue

19  generated from in-app purchases is substantially greater than the revenue generated by pay-to-

20  download apps.

21  156.    A payment processing method that requires the user to exit an app to complete a

22  transaction cannot substitute for one that consummates transactions within the app. The more friction

23  and time a payment requires, the less likely a consumer is to complete the transaction. Developers

24  and consumers alike would not regard a payment processing product that required exiting the app as

25  reasonably interchangeable with payment processors that support in-app payment.

26  157.    In particular, purchasing through a developer's website is not a substitute for in-app

27  payment processing. Not only would this require the user to exit the app, but Google's policies

28

1  prohibit developers from referring or directing users to websites for payment outside the app

2  environment.

3      158.    Moreover, the Android in-app payment processing market is distinct from app

4  distribution, as they are separate products and separate demand exists for each. In other digital

5  ecosystems, payment and distribution services are routinely sold separately. In fact, Google already

6  allows this within the Android mobile ecosystem: developers may use a third-party payment

7  processor like Adyen, PayPal, and Braintree for in-app purchases of physical products and out-of-app

8  goods and services such as those offered through Amazon, Airbnb, and Uber. Thus, developers do

9  not use Google Play Billing to process payments "for the purchase or rental of physical goods (such

10  as groceries, clothing, housewares, electronics)"; "for the purchase of physical services (such as

11  transportation services, cleaning services, airfare, gym memberships, food delivery, tickets for live

12  events)"; or "a remittance in respect of a credit card bill or utility bill (such as cable and

13  telecommunications services)."

14      **2.    Google has Unlawfully Tied the Google Play Store to Google Play's Billing**

15      159.    Under the DDA, developers are required to enter into a separate agreement with "[a]

16  Google-affiliated entity providing services that enable Developers to receive payments for Products

17  sold via Google Play," to use Google's billing system for all digital content sold in apps downloaded

18  through the Play Store.

19      160.    Google's DDA also requires that developers comply with Google's Developer

20  Program Policies. Those policies require:

21      1.    Developers charging for app downloads from Google Play must use Google Play's billing system as the method of payment for those transactions.

23      2.    Play-distributed apps requiring or accepting payment for access to in-app features or services, including any app functionality, digital content or goods (collectively "in-app purchases"), must use Google Play's billing system for those transactions unless Section 3 or Section 8 applies.[5]

---

[5] *Google Play Developer Program Policy, Payments*, Google LLC, https://support.google.com/googleplay/android-developer/answer/9858738 (last visited June 2, 2025).

161.    Google discloses its charges for this service as follows:

| Service fee type | Service fee |
|---|---|
| Developers enrolled in the 15% service fee tier | **15%** for the first $1M (USD) revenue earned by the developer each year <br><br> **30%** for earnings in excess of $1M (USD) revenue earned by the developer each year |
| Subscriptions | **15%** for automatically renewing subscription products purchased by subscribers, regardless of revenue earned by the developer each year |
| Other transactions | **15% or lower** for eligible developers who qualify under programs such as the Play Media Experience Program |

For developers who offer an alternative billing system in addition to Google Play's billing system for transactions with users in South Korea or India, in accordance with the Payments policy, and pursuant to the applicable terms of service ("Alternative Billing System"), the service fee for such transactions using the Alternative Billing System is equal to the service fee applicable for transactions via Google Play's billing system reduced by 4%. Learn more about offering an alternative billing system for users in South Korea in this Help Center article or India in this Help Center article.

162.    Furthermore, for payments subject to Google's requirement to use Google's billing system, developers are prohibited from "lead[ing] users to a payment method other than Google Play's billing system." This provision bars developers from linking to a website or other service that would process payments more cheaply. This includes, but is not limited to, leading users to alternative payment methods via "An app's listing in Google Play; In-app promotions related to purchasable content; In-app webviews, buttons, links, messaging, advertisements or other calls to action; and In-app user interface flows . . . that lead users from an app to a payment method other than Google Play's billing system."

163.    Together, these provisions tie the use of the Google Play Store to Google Play's billing system.

3.      **Where Google Allows Alternative Billing Methods, it Imposes Restrictions and High Commissions that Enforce its Anticompetitive Tie and Foreclose Competition**

164.    In 2021, Korea became the first country to force both Google and Apple to allow app developers to use third party payment methods for in-app purchases by amending the Telecommunications Business Act. As a result, Google was forced to offer developers "the ability to offer an alternative billing system alongside Google Play's billing system for mobile and tablet users in South Korea."

165.    However, Google imposes onerous restrictions on alternative billing to deter and even penalize developers that choose to offer alternative billing. Under the alternative billing option for the Korean market, app developers are contractually required to offer Google Play's billing system alongside the third-party provider for in-app purchases. That is, developers cannot solely offer the third-party billing option.

166.    Moreover, "[i]f a user pays through an alternative billing system," Google *still collects a commission* that is only 4% less than Google's usual 30% (or 15%) rate. As a result, developers are still charged a supracompetitive rate of 26% (or 11%) when users are able to pay through a third-party provider.

167.    Google refers to the option to offer a third-party payment processing provider, with the requirement to offer Google Play Billing alongside it, as "User Choice Billing." Google has recently expanded User Choice Billing to additional countries due to regulatory and litigation pressure. In 2022, Google was forced to allow developers the ability to offer an alternative billing system alongside Google Play's billing for users in the European Economic Area, due to the passage of the Digital Markets Act. Later in 2022, Google expanded User Choice Billing to users in additional markets, including Australia, India, the U.S., Indonesia, and Japan.

168.    But Google's User Choice Billing does not give developers a real choice. This is because under User Choice Billing, "[i]f a user pays through an alternative billing system," Google still collects a commission that is 4% less than its usual rate.

169.    There is currently no alternative payment provider that charges less than 4% for in-app payment processing.

170.    Google deliberately set commissions in a manner that deprived developers a financial incentive to use anything other than Google Play's billing system. Google acknowledged in its internal documents that charging only 5% less than its usual rate for alternative billing methods would be "essentially replacement value", meaning that developers would end up paying the same, or more, than if they simply used Google's billing method exclusively. Google's documents also acknowledge: "[o]f course, as we noted, at a reduction of 5%, we don't think this solves the problems of any devs who are complaining about price." Predictably, by May 2023—more than a year since Google launched User Choice Billing—only 75 or 80 Android developers had signed up for User Choice Billing.

171.    Google believes that the average cost for Google's in-app payment services, including payment processing and the cost of evaluating app security, is about 6%.

172.    In Europe, Google also allowed developers of *non-gaming apps* to use alternative billing *without* the requirement to offer it alongside Google Play's billing system. Again, Google was forced to offer this policy to comply with the Digital Markets Act rather than due to competition. Google referred to this as alternative billing "without user choice."

173.    Google still collects a commission "[w]hen a consumer purchases through an alternative billing system without user choice." In these cases, Google reduces its usual rate by only 3%.

174.    There are no pro-competitive justifications for Google's contractual impositions on developers' ability to offer alternative billing methods or its anticompetitive fees when developers are allowed to use alternative billing methods. The impositions and anticompetitive commissions are designed to enforce the tying of the Google Play Store to Google Play's billing system.

## G.    Google's Conduct Harms Developers and Competition

175.    Google could not maintain its exorbitant commission in a competitive market free from Google's tying and other anticompetitive conduct as alleged herein. The commission is an order

1    of magnitude higher than fees for platforms in which there is competition for electronic payment

2    processing.

3        176.    Google's practices harm developers and competition by depressing output, stifling

4    innovation, limiting choice, and extracting a supracompetitive tax of up to 30% on paid apps

5    purchased through the Google Play Store and purchases of in-app digital content using Google Play's

6    billing method. But for Google's anticompetitive restrictions, app developers would be able to

7    distribute their apps through alternative methods, including by providing apps directly to consumers,

8    selling apps through independent app stores, creating their own competing app stores, or forming

9    business relationships with device manufacturers that could preinstall apps.

10       177.    Google's abusive behavior restricts Android app developers' ability to choose

11   different avenues of app distribution and in-app payment processing. As a result, consumers are

12   denied the choice of obtaining apps and in-app digital products through methods other than the Google

13   Play Store and Google Play Billing. But for Google's conduct, Android app developers would have

14   more avenues to sell their digital content, and consumers would have more avenues from which they

15   can purchase such digital content.

16       178.    Google's abusive behavior limits the number of Android apps and in-app digital

17   products sold, thereby limiting output in the global markets, excluding China, for Android app

18   distribution and in-app payment processing. But for Google's conduct, competition in the market for

19   Android app distribution will result in a multitude of ways Android app developers can distribute

20   their apps, thereby increasing the likelihood that such apps are seen and purchased by consumers.

21   Such increase in Android app distribution would result in an increase in in-app purchases, thus

22   increasing output in the market for Android in-app payment processing. Similarly, competition will

23   increase output in the market for Android in-app payment processing due to the competitive

24   commission rate that would result from such competition.

25       179.    Google's abusive behavior stifles innovation in the global markets, excluding China,

26   for Android app distribution and in-app payment processing. Without Google's exclusive-dealing

27

28

mandate and onerous restrictions, developers would have more innovative options for Android app distribution and in-app payment processing.

180.    By requiring that apps purchased through the Google Play Store use Google Play's billing method for the purchase of digital content, and otherwise imposing onerous restrictions that deter and penalize developers who choose to offer alternative billing methods, developers lose features like the following, which are not offered by Google Play's billing system but are available through developers' own proprietary payment systems or processors like Adyen and WorldPay:

a.    Key information about failed consumer in-app purchase transactions, such as the specific reason for the failure (*e.g.*, insufficient funds). Google Play's billing system indicates only that a problem exists with the transaction without further description.

b.    Features that minimize "involuntary churn," or the inadvertent loss of users through short-term credit card issues such as a credit card expiring or being put on hold.

c.    Data indicating that a given consumer card has been recently used successfully with other merchants. This data can increase a developer's confidence that the consumer is likely to pay.

181.    In a competitive market for in-app payment processing, developers could create their own payment infrastructure, or accept third party payment processing (without being double-charged)—just as retailers accept different types of payment including credit, debit, and prepaid cards. Developers could offer payment systems based on alternative currencies or billing to cell phone carriers. These innovations are substantially foreclosed by Google's anticompetitive contractual requirements.

182.    Indeed, native and third-party payment processing products can be better tailored to developers' needs. Absent Google's exclusive-dealing requirements and onerous restrictions, developers could compete in the in-app payment processing market themselves or partner with third-party payment processors that charge a fraction of what Google extracts. This would allow developers to offer not only competitive pricing but also a variety of payment options tailored to their users' needs. For example, in many countries outside the United States, users can purchase pre-paid

"Paysafecards" in convenience stores that can then be used to purchase in-game content without connecting to a credit card or bank account. Developers have the best information on their own business models and are thus best placed to select their own payment processing solutions.

183.    Google also harms developers by preventing them from efficiently informing consumers *through their app* of lower-priced payment options for in-app purchases and app subscriptions, forcing developers to incur additional costs to communicate through other means. Developers whose only relationship with their customers is through their app are effectively foreclosed from providing this information. Communication through an app is low-cost and efficient. But Google stops any such communication that threatens its in-app-payment processing monopoly, thus distorting the competitive process and harming consumers, many of whom are unable to learn about better deals.

184.    There is no pro-competitive or otherwise justified reason for Google's conduct or the supracompetitive service fee that Google charges app developers for app distribution and in-app payment processing.

185.    Google pretextually defends its tie by citing security concerns, but there are many highly secure and reliable payment processing systems. In fact, security is equally important to payment systems for both digital and physical content, and yet Google forces the use of Google Play's billing system only for digital content.

## VI.    THE SMALL APP DEVELOPER SETTLEMENT

186.    On July 21, 2021, a consolidated complaint was filed against Google in this Court seeking injunctive relief and to recover damages arising from Google's conduct related to Android app distribution and in-app payment processing on behalf of the following proposed class:

> All U.S. persons or entities that paid Google a "service fee" on: (a) any paid Android OS app sold in or via the Google Play store, in or via any U.S. or foreign Google Play storefront; or (b) any paid in-app digital content (including subscriptions) sold via Google Play Billing on an Android OS app distributed via the Google Play Store, in or via any U.S. or foreign Google Play storefront.

187.    On June 29, 2022, the Small App Developer Settlement was reached in that class action on behalf of a settlement class defined as:

all former or current U.S. Developers that meet each of the following criteria: (a) sold an application or in-app product (including subscriptions) for a nonzero price between August 17, 2016 and December 31, 2021; (b) paid Google a service fee greater than 15% on at least one such transaction between August 17, 2016 and December 31, 2021; and (c) earned Proceeds between U.S. $0 and U.S. $2,000,000.00 through Google Play in every calendar year between and inclusive of 2016 and 2021.

188.    Pursuant to that Small App Developer Settlement, members of the settlement class who did not opt-out agreed to release, in relevant part, Google from the following:

all past, present, and future claims, actions, demands, causes of action, suits, debts, obligations, damages, rights and liabilities, that were brought, could have been brought, or arise from the same facts underlying the claims asserted in the Action, known or unknown, recognized now or hereafter, existing or preexisting, expected or unexpected, pursuant to any theory of recovery recognized or available now or hereafter (including, but not limited to, those based in contract or tort, common law or equity, federal, state, territorial, or local law, statute, ordinance, or regulation), against the Released Parties, for any type of relief that can be released as a matter of law, including, without limitation, claims for monetary relief, damages (whether compensatory, consequential, punitive, exemplary, liquidated, and/or statutory), costs, penalties, interest, attorneys' fees, litigation costs, restitution, or equitable relief.

189.    By its plain language, the Small App Developer Settlement does not release (a) U.S.-based App developers who had Google Play proceeds of $2,000,000.01 or more in a calendar year and (b) non-U.S. based App developers who received any Google Play proceeds from the U.S. or non-U.S. Google Play storefronts.

190.    None of Plaintiffs' claims or those of the Classes here are precluded or released by the Small App Developer Settlement.

## VII.    STANDING

191.    Plaintiffs PangSky, OverX, the Android app developer members of KPA and KEPA, and members of the Classes are direct purchasers of Google's Android app distribution and payment processing services. As such, they have standing to pursue their claims.

192.    KPA and KEPA have associational standing to sue on behalf of their Android app developer members. KPA and KEPA's Android-developer members would undoubtedly have standing, the interests KPA and KEPA seek to protect are germane to their purpose, and their claims and relief sought does not require participation of their individual members. KPA and KEPA's

1    Android app developer members have suffered harm due to Google's unlawful conduct as alleged

2    herein. KPA and KEPA can therefore pursue their claims under Federal Rule of Civil Procedure 23(a)

3    and 23(b)(2).

4         193.    KPA and KEPA members include Android app developers. Those members distribute

5    their Android apps and in-app products, and process payments associated with their Android apps

6    through the Google Play Store storefront in the United States and elsewhere. KPA and KEPA have

7    one or more members who are parties to Google's DDA and guidelines referenced in this Complaint.

8    During the Class Periods, one or more members of KPA and KEPA paid supracompetitive

9    commissions on purchases and payments related to the distribution of their Android apps. One or

10   more members of KPA and KEPA have been injured by Google's unlawful conduct as alleged herein.

11   **VIII.   RELEVANT MARKETS**

12   **A.    First Relevant Product and Geographic Market**

13        194.    The antitrust injuries alleged herein, including harm to developers and competition,

14   have occurred in the global market, excluding China, for Android app distribution. *See In re Google*

15   *Play*, Dkt. No. 866 (Verdict Form, Question 2(1) (jury finding of a relevant market for "Android app

16   distribution market")); *Epic Games, Inc. v. Apple Inc*., 559 F. Supp. 3d 898 (N.D. Cal. 2021); *see also*

17   *id*. at 1027 ("the Court finds the area of effective competition in the geographic market to be global,

18   with the exception of China.").

19        195.    As Epic's economic expert explained:

20             China has erected barriers that limit the ability of users in China to use
               various non-Chinese apps, limit the ability of OEMs to choose the
21             Google version of the Android OS, and limit developers outside of
               China from providing apps to Chinese users. Smartphones with the
22             version of Android used in China are generally not sold outside of
               China, and smartphones that have the Google version of Android are
23             generally not sold in China. That has resulted in a separate smartphone
               app ecosystem in China. Many of the most popular non-Chinese apps
24             are not available in China, and the most popular Chinese apps have
               generally not been successful outside of China.
25
          196.    Google has market power in this market. As the EC has found, Google and the Google
26
     Play Store, via various anticompetitive practices, have acquired roughly 90 percent of the market
27
     worldwide in Android app distribution.
28

197.    Due to the incompatibility of Apple's iOS with Google's Android OS, as well as the incompatibility of Apple's iOS and Google's Android digital products as alleged herein, and the high switching costs among both developers and consumers, Apple and its Apple Store offer no reasonable competition to, and are not a substitute for, the Google Play Store and Google's Android app distribution.

198.    Competitors for Android app distribution exist, such as Aptoide and Samsung, and the Epic App store, but they are presently weak in terms of their own market power. Google perpetuates its dominance of the Android app distribution market through its unlawful contracts, policies, and actions, as alleged herein.

199.    Korea's antitrust regulator fined Google 42.1 billion won ($31.88 million) for blocking the release of mobile video games on a competitor app store, OneStore, by requiring video game makers to exclusively release their titles in the Google Play Store in exchange for providing in-app exposure between June 2016 and April 2018. As of the filing of this Complaint, no competitor has made a material dent in Google's market share.

200.    Developers, industry, and competition decisions in the United States and globally recognize that the Android app distribution market alleged herein is a discrete one, which Google monopolizes.

201.    Google's restraints on competition have resulted in a foreseeable and direct impact on the global market, excluding China, for Android app distribution.

202.    Google is a direct seller of distribution services to Android app developers for the sale of apps in or via the Google Play Store and for add-ons and other products sold in those apps. As Google admits, "[m]ore than two million developers use Google Play to reach 2.5 billion users in 190 countries." Plaintiffs herein purchased these distribution services from Google and seek relief for injuries suffered in this relevant market, including as to overpayments made to Google related to sales in or via any Google Play Store storefront (excluding China).

**B.    Second Relevant Product and Geographic Market**

203.    The antitrust injuries alleged herein, including harm to developers and competition, have occurred in the global market, excluding China, for Android in-app payment processing, *i.e.*, for payment processing services provided to Android app developers for these products. *See In re Google Play*, Dkt. No. 866 (Verdict Form, Question 2(2) (jury finding of a relevant market for "Android in app billing services for digital goods and services transactions")); *Apple Inc.*, 559 F. Supp. 3d at 990; *see also id.* at 1027 ("the Court finds the area of effective competition in the geographic market to be global, with the exception of China.").

204.    Google requires every Android app developer to enter its standardized Play App Signing Terms of Service, Google Play Developer Distribution Agreement, and Google Play Developer Program Policies, and attached agreements, schedules, and exhibits, to make their apps and in-app digital products available to end-users. The relevant provisions of these agreements, including Google's supracompetitive service fees and restriction on the use of in-app payment processing, unreasonably restrain competition, as alleged herein.

205.    The cross-elasticity of demand between Google's in-app payment processing and other in-app payment processing providers for Android apps is zero, or near zero. Though Android app developers are allowed to use third-party payment providers for purchases to users in certain jurisdictions, Google's supracompetitive 26 to 27% (or 11 to 12%) service fees for the use of third-party payment providers deter and penalize developers that choose to utilize third-party payment processing. Given that all app developers who want to distribute apps must pay Google's supracompetitive fee as well as pay the third-party payment provider, a small but significant price increase in Google's in-app payment processing will not result in a significant number of developers switching to third-party payment providers.

206.    As described herein, Google's willful acquisition and maintenance of monopoly power in this market, which it has obtained by foreclosing the ability of Android app developers to use third-party payment providers, and demanding a supracompetitive commission rate when they do, has harmed app developers and resulted in higher fees as compared to a world with competition. Google's

restraints on competition directly impact the global market, excluding China, for Android in-app payment processing.

207.    Google has foreclosed actual and potential competitors in the market by abusive contracts, policies, and actions. And given the high sales and monetary value of in-app products, the effect on commerce in the market for these services is substantial.

## IX.    GOOGLE HAS CONTINUOUSLY VIOLATED THE ANTITRUST LAWS

208.    Plaintiffs allege a continuing course of anticompetitive conduct by Defendants because of Google's continuous conduct to maintain its market power to charge supracompetitive monopoly rents, imposing contractual anti-steering provisions on app developers and implementing scare screens in user devices, continuously enforcing its anticompetitive restrictions; and by utilizing other means to monopolize the relevant markets and maintain its supracompetitive revenue stream, and as a direct and proximate result of Google's overt, anticompetitive actions as described in this Complaint, Plaintiffs and members of the Classes have suffered actual or threatened injury in a manner and amount to be proven at trial.

209.    Google has continuously enforced its anticompetitive policies through every initial app review and review of app updates. Google boasts on its app review page that "[t]he App content page is where you provide and manage the information we need to ensure that your app is safe for its intended users, is compliant with Google Play Developer Program Policies, and satisfies legal requirements." Google further informs developers that "[w]e'll let you know if we find any issues. To comply with Google Play policies, you should review the information you've provided regularly, and make sure that it's kept up to date." The same is true for app updates: "[u]pdates to existing apps are processed as usual. After it's approved, you control exactly when the changes are published." On June 29, 2023, Google announced that it uses "machine learning to scan apps for policy violations" and that it has "teams of human reviewers who manually review apps for policy violations." Google's policies that its app review seeks to ensure compliance with include, for example, the prohibition on providing alternative payment processing methods and steering customers to the same. In short, Google's app review and review of app updates is the way in which Google continuously enforces

1    the anticompetitive restrictions noted herein to maintain its monopolies in Android app distribution

2    and in-app payment processing and tie the Google Play Store to Google Play's billing.

3        210.    Google continuously implements technical restrictions to sideloading and ensures

4    these restrictions are incorporated in every Android OS update, while falsely touting that its system

5    allows consumers to directly download apps. This has allowed Google to continuously maintain its

6    hold on Android app distribution by dissuading Android users from sideloading and funneling

7    downloads through the Google Play Store.

8        211.    On July 1, 2021, Google reduced its anticompetitive 30% rate to 15% for the first

9    million dollars of app developer revenues. Google changed its commission rate so as to allow it to

10   publicly present a favorable change for developers and dissuade challenges to its policies, while at

11   the same time allowing Google to maintain its monopolistic revenue stream from developers earning

12   more than $1 million per year and continue imposing the anticompetitive restrictions noted herein.

13       212.    On September 30, 2021, Google refined its payment policy, noting that "[w]e're

14   updating our Payments policy to clarify when Google Play's billing system should be used for in-app

15   purchases." Google explained that "[a]ny existing app that is currently using an alternative billing

16   system will need to remove it to comply with this update." Google's refining of its policies and its

17   requirement that Android app developers comply is an extension of its anticompetitive course of

18   conduct to ensure it maintains its monopolies in Android app distribution and in-app payment

19   processing.

20       213.    In or around November 2021, Google's purported compliance with the

21   Telecommunications Business Act introduced new anticompetitive 26% commissions in Korea. In

22   reducing its fees by only 4%, Google continues to tie the use of the Google Play Store to Google

23   Play's billing as a practical matter. Google is aware that obtaining third-party payment processing

24   services would cost more than the measly 4% reduction to its standard rate.

25       214.    Similarly, in November 2022, Google introduced User Choice Billing in the U.S.

26   Though it allowed alternative payment methods to Google Play's billing, Google reduced its fee by

27   only 4% when a developer utilizes the alternative payment method. Google's change in policy

28

1    introduced a new anticompetitive commission in the U.S. that it knew would result in tying the Google

2    Play Store to Google Play's billing as a practical matter. Google is aware that obtaining third-party

3    payment processing services would cost more than the 4% reduction to its standard rate. As of May

4    2023, "about 75 or 80 developers" took part in the User Choice Billing program. Google also

5    specifically excluded gaming app developers from User Choice Billing. That is, gaming apps may

6    not use alternative payment processing providers. By introducing User Choice Billing in the U.S. but

7    excluding gaming apps from the program, Google's policy changed again allowing it to publicly

8    present a favorable change for developers and dissuade challenges to its policies, while at the same

9    time allowing Google to maintain its monopolistic revenue stream from gaming app developers and

10   continue imposing the anticompetitive restrictions noted herein.

11       215.    In September 2024, following this Court's injunction in *Epic Games, Inc. v. Google

12   LLC*, Samsung, at the behest of Google, changed its Auto Blocker default settings to "on." When

13   Auto Blocker is "on," it disables the installation of apps from sources other than Google's Play Store

14   and Samsung Galaxy Store.

15       216.    Further, within the relevant limitations period, Google has changed and then bound

16   app developers to its anticompetitive terms and conditions in order to reinforce and further the

17   anticompetitive conduct alleged herein. Google modified and fine-tuned its anticompetitive DDA

18   within the last four years. The October 3, 2022 modification "updated section 3.4 to clarify the

19   mechanism to charge the Service Fee (including any applicable taxes)." The October 3, 2022

20   modification also "updated the definition of Payment Processor to clarify that this term refers to a

21   Google-affiliated entity providing services that enable developers to receive payments for Products

22   sold via Google Play." In the August 29, 2023 modification, Google "revised section 3.1 to that

23   subject to a developer accepting the terms of the DDA, Google will allow the developer to use Google

24   Play for their products." Section 3.1 of the preceding October 3, 2022 DDA only noted, "You hereby

25   appoint Google as Your agent or marketplace service provider as outlined here to make Your Products

26   available in Google Play." Google's modifications of the DDA were in order to reinforce Google's

27

28

1  anticompetitive restrictions and ensure Google maintains its monopolies in Android app distribution

2  and in-app payment processing.

3       217.    Google has also engaged in conduct during the relevant limitations period, such as

4  reminding employees to "communicate with care" (which is a euphemism for obscuring evidence of

5  anticompetitive conduct) in order to further the objectives of its anticompetitive policies. Google has

6  also destroyed relevant evidence of its anticompetitive conduct during the relevant limitations period

7  in order to maintain its anticompetitive policies, including during periods of time that it was under a

8  legal obligation to preserve such evidence. During the relevant limitations period, Google employees

9  were instructed to, and did, improperly assert attorney/client privilege and work product protections

10 with respect to documents containing damaging admissions of the company's participation in

11 anticompetitive conduct in order to conceal them from discovery by the government and other parties

12 seeking discoverable evidence of Google's illegal conduct.

13 **X.    CLAIMS FOR RELIEF**

14 **FIRST CAUSE OF ACTION: MONOPOLIZATION OF THE ANDROID APP
DISTRIBUTION MARKET**
15 **Plaintiffs, on behalf of themselves and the
App Developer Class**
16 **(15 U.S.C. §§ 2, 3)**

17      218.    Plaintiffs incorporate by reference all the allegations above as if set forth herein in full.

18      219.    Plaintiffs PangSky and OverX bring this claim on behalf of themselves and the App

19 Developer Class as defined above.

20      220.    Plaintiffs KPA and KEPA bring this claim for injunctive relief on behalf of their

21 Android-developer members that have sold and/or intend to sell Android apps and in-app products to

22 customers located in the U.S. and its territories.

23      221.    Google possesses monopoly power in the global market, excluding China, for Android

24 app distribution.

25      222.    Google has the power to exclude competition in the relevant market, and it has

26 willfully used that power, including by way of its unlawful practices as described herein, in order to

27 achieve, maintain, and expand its monopoly power in that market.

28

223.    For the reasons alleged herein, substantial barriers to entry and expansion exist in the relevant market.

224.    Google's conduct as described herein is exclusionary vis-à-vis its potential rivals in the market for Android app distribution.

225.    Google's conduct affects a substantial volume of interstate and/or foreign commerce.

226.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

227.    There is no valid pro-competitive justification for Google's conduct.

228.    To the extent there are available non-pretextual pro-competitive justifications for Google's conduct, there exist less-restrictive alternatives to achieve the justification posited. Moreover, Google's behavior fails a balancing test between anticompetitive harms and pro-competitive benefits.

229.    Plaintiffs have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying Google for app distribution services.

230.    In December 2023, the jury in *In re Google Play* found that Google willfully acquired or maintained its monopoly in the global market, excluding China, for Android app distribution. That verdict acts as an estoppel and this claim may not be relitigated by Google.

**SECOND CAUSE OF ACTION: MONOPOLIZATION OF THE MARKET FOR ANDORID IN-APP PAYMENT PROCESSING**
**Plaintiffs, on behalf of themselves and the**
**App Developer Class**
**(15 U.S.C. §§ 2, 3)**

231.    Plaintiffs incorporate by reference all the allegations above as if set forth herein in full.

232.    Plaintiffs PangSky and OverX bring this claim on behalf of themselves and the App Developer Class as defined above.

233.    Plaintiffs KPA and KEPA bring this claim for injunctive relief on behalf of their Android-developer members that have sold and/or intend to sell Android apps and in-app products to customers located in the U.S. and its territories.

234.    Google possesses monopoly power in the global market, excluding China, for Android in-app payment processing, *i.e.*, for payment processing provided to Android app developers.

235.    Google has the power to exclude competition in the relevant market, and it has willfully used that power, including by way of its unlawful practices as described herein, in order to achieve, maintain, and expand its monopoly power in that market.

236.    For the reasons alleged herein, substantial barriers to entry and expansion exist in the relevant market.

237.    Google's conduct as described herein is exclusionary vis-à-vis its potential rivals in the market for Android in-app payment processing.

238.    Google's conduct affects a substantial volume of interstate and/or foreign commerce.

239.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

240.    There is no valid pro-competitive justification for Google's conduct.

241.    To the extent there are available non-pretextual pro-competitive justifications for Google's conduct, there exist less-restrictive alternatives to achieve the justification posited. Moreover, Google's behavior fails a balancing test between anticompetitive harms and pro-competitive benefits.

242.    Plaintiffs have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying Google for in-app payment processing.

243.    In December 2023, the jury in *In re Google Play* found that Google willfully acquired or maintained its monopoly in the global market, excluding China, for Android in-app billing services for digital goods and services transactions (*i.e.*, Android in-app payment processing). That verdict acts as an estoppel and this claim may not be relitigated by Google.

**THIRD CAUSE OF ACTION: RESTRAINT OF TRADE OF THE MARKET FOR IN-APP PAYMENT PROCESSING**
**Plaintiffs, on behalf of themselves and the**
**App Developer Class**
**(15 U.S.C. §§ 1, 3)**

244.    Plaintiffs incorporate by reference all the allegations above as if set forth herein in full.

245.    Plaintiffs PangSky and OverX bring this claim on behalf of themselves and the App Developer Class as defined above.

246.    Plaintiffs KPA and KEPA bring this claim for injunctive relief on behalf of their Android-developer members that have sold and/or intend to sell Android apps and in-app products to customers located in the U.S. and its territories.

247.    Google's conduct violates Sections 1 and 3 of the Sherman Act, which prohibit "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce. . . ." 15 U.S.C. §§ 1, 3.

248.    Google requires app developers to enter its standardized Google Play Developer Distribution Agreement, including policies integrated into that agreement such as the Developer Program Policies, as a condition of having their apps distributed through Google's monopolized app store, Google Play. The relevant provisions of these agreements unreasonably restrain competition in the global market, excluding China, for Android in-app payment processing.

249.    The DDA requires that Android app developers enter into a separate agreement with Google's payment processor in order to receive payment for apps and content distributed through Google Play. This includes payments related to in-app purchases of digital content. Further, the DDA requires compliance with Google's policies, which note that developers "must use Google's billing system" for in-app purchases, for which Google charges a supracompetitive service fee as alleged herein.

250.    Similarly, Google's alternative billing policies restrain its potential competitors, as alleged herein. During time periods relevant to the allegations set forth herein, Google has allowed developers to offer alternative billing methods in select jurisdictions including Korea, the U.S., India, and the EEA, due to regulatory decree. Except for the EEA, Google requires developers to offer Google's billing system alongside a third-party payment processor. Google also charges developers

supracompetitive service fees even when a user chooses to pay through a third-party payment processor, thereby deterring and penalizing developers that choose to offer an alternative billing method.

251.    The challenged provisions serve no sufficient legitimate or pro-competitive purpose and unreasonably restrain competition in the relevant market for Android in-app payment processing.

252.    Google's conduct affects a substantial volume of interstate and/or foreign commerce.

253.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

254.    There is no valid pro-competitive justification for Google's conduct.

255.    To the extent there are available non-pretextual pro-competitive justifications for Google's conduct, there exist less-restrictive alternatives to achieve the justification posited. Moreover, Google's behavior fails a balancing test between anticompetitive harms and pro-competitive benefits.

256.    Plaintiffs have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying Google for in-app payment processing services.

257.    In December 2023, the jury in *In re Google Play* found that Google unreasonably restrained trade for the reasons alleged herein in the global market, excluding China, for Android in-app billing services for digital goods and services transactions (*i.e.*, Android in-app payment processing). That verdict acts as an estoppel and this claim may not be relitigated by Google.

**FOURTH CAUSE OF ACTION: TYING AS ALTERNATIVE BASIS FOR RESTRAINT OF TRADE RE: IN-APP PAYMENT PROCESSING**
**Plaintiffs, on behalf of themselves and the**
**App Developer Class**
**(15 U.S.C. §§ 1, 3)**

258.    Plaintiffs incorporate by reference all the allegations above as if set forth herein in full.

259.    Plaintiffs PangSky and OverX bring this claim on behalf of themselves and the App Developer Class as defined above.

260.    Plaintiffs KPA and KEPA bring this claim for injunctive relief on behalf of their Android-developer members that have sold and/or intend to sell Android apps and in-app products to customers located in the U.S. and its territories.

261.    Google's conduct violates Sections 1 and 3 of the Sherman Act, which prohibit "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce. . . ." 15 U.S.C. §§ 1, 3.

262.    Google has unlawfully tied distribution services for Google Play to its in-app payment processor, Google Play's billing method, through the Google Play Developer Distribution Agreement, including policies integrated into that agreement such as the Developer Program Policies.

263.    As demonstrated herein, Google has immense, monopoly power in the tying market—the global market excluding China, for Android app distribution.

264.    The availability of Google Play for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing method. Google's substantial foreclosure of, and restraints against, alternative app distribution channels thus forces developers, including the Plaintiffs, to use Google's in-app payment processing.

265.    The tying product, Android app distribution, is distinct from the tied product, Android in-app payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of how an Android app is distributed. Google's unlawful tying arrangement thus ties two separate products that are in separate markets. Google's contract and written policies underscore their separate nature.

266.    Google's conduct restrains competition in the global market, excluding China, for Android in-app payment processing. Given the volume of transactions and the money at issue, Google's conduct affects a substantial volume of commerce in that market.

267.    Google has thus engaged in a *per se* illegal tying arrangement.

268.    In the alternative only, even if Google's tying conduct does not constitute a *per se* violation of the law, a rule-of-reason analysis of Google's tying arrangement also would demonstrate that it violates the law.

269.    As app developers that utilize in-app payment processing services, Plaintiffs have been harmed by Google's anticompetitive conduct. Plaintiffs have suffered and continue to suffer damages and irreparable injury, including ongoing harm to their businesses, and such damages and injury will not abate until the Court issues an injunction ending Google's anticompetitive conduct.

270.    In December 2023, the jury in *In re Google Play* found that Google unlawfully tied the use of the Google Play Store to the use of Google Play Billing. That verdict acts as an estoppel and this claim may not be relitigated by Google.

**FIFTH CAUSE OF ACTION: VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Plaintiffs PangSky and OverX on behalf of themselves and the**
**App Developer Class**
**(CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*)**

271.    Plaintiffs PangSky and OverX incorporate by reference all the allegations above as if set forth herein in full.

272.    Plaintiffs PangSky and OverX bring this claim on behalf of themselves and the App Developer Class as defined above.

273.    California's Unfair Competition Law ("UCL") defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. Cal. Bus. & Prof. Code §§ 17200 *et seq.* As these are stated in the disjunctive, the UCL sets up three prongs—the unlawful, unfair, and fraudulent prongs—the violation of any of which constitutes a violation of the UCL.

274.    Google has engaged in, and continues to engage in, acts of unfair competition as defined in California's UCL. More specifically, Google, based upon the conduct alleged herein, has violated the unlawful and unfair prongs of the UCL.

**A.    Google's Conduct is Unlawful**

275.    Google's acts of unfair competition include its violations of the Sherman and Cartwright Acts as alleged herein. Therefore, Google has violated the unlawful prong of the UCL. Google's unlawful conduct has caused Plaintiffs to suffer injury in fact. Because Plaintiffs have overpaid for distribution and in-app payment processing fees, they have lost money or property as a result of Google's unlawful behavior.

**B.    Google's Conduct is Unfair**

276.   Google's conduct constitutes "unfair" business acts and practices because its practices have caused and are "likely to cause substantial injury" to Plaintiffs that is not "reasonably avoidable" by Plaintiffs and is "not outweighed" by the practices' benefits to the Plaintiffs.

277.   Google's conduct is also "unfair" because it is contrary to the spirit and purpose of the Sherman and Cartwright Acts. The conduct has both an actual and a threatened impact on competition. Google's unfair conduct has caused Plaintiffs to suffer injury in fact. Because Plaintiffs have overpaid for distribution and in-app payment processing fees, they have lost money or property as a result of Google's unfair behavior.

278.   Under both the unlawful and unfair prongs of the UCL, Plaintiffs are entitled to an injunction to prevent Google from persisting in its behavior to their detriment.

279.   In October 2024, the Court in *In re Google Play* found that Google's conduct violated the UCL's "unlawful" and "unfair" prongs. That finding acts as an estoppel and this claim may not be relitigated by Google.

**SIXTH CAUSE OF ACTION: VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT**
**Plaintiffs PangSky and OverX on behalf of themselves and the**
**App Developer Class**
**(CAL. BUS. & PROF. CODE §§ 16700 *ET SEQ.*)**

280.   Plaintiffs PangSky and OverX incorporate by reference all the allegations above as if set forth herein in full.

281.   Plaintiffs PangSky and OverX bring this claim on behalf of themselves and the App Developer Class as defined above.

282.   Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

283.   Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

284.    The global market, excluding China, for Android app distribution, *i.e.*, for distribution services provided to Android app developers, is a valid antitrust market.

285.    The global market, excluding China, for Android in-app payment processing, *i.e.*, for payment processing provided to Android app developers, is a valid antitrust market.

286.    Google has market power in these valid antitrust markets.

287.    Google has executed agreements with original equipment manufacturers and app developers that unreasonably restrict competition in these valid antitrust markets, as alleged herein, including at least the following agreements: DDA agreements with app developers; agreements with Google's competitors and potential competitors under the umbrella of Project Hug and Games Velocity Program; and agreements with OEMs, including MADA and RSA agreements.

288.    Additionally, the availability of Google Play for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing. Google's substantial foreclosure of, and restraints against, alternative app distribution channels thus forces developers, including the Plaintiffs, to use Google's in-app payment processing.

289.    Google has unlawfully tied distribution services for Google Play to Google Play Billing through its Google Developer Distribution Agreements with app developers and incorporated agreements including the Developer Program Policies.

290.    The challenged conduct serves no sufficient legitimate or pro-competitive purpose and unreasonably restrains competition in the global markets, excluding China, for Android app distribution and Android in-app payment processing.

291.    Google's alternative billing policies, which have been forced on it in certain jurisdictions, including the U.S., Korea, India, and the EEA, further the harm caused by Google's anticompetitive policies. Under Google's alternative billing policies, Google charges developers a uniform supracompetitive service fee of 26% or 27% (or 11% or 12%) even when a user chooses to pay through a third-party payment processor, thereby deterring and penalizing developers that choose to offer an alternative billing method.

292.     Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

293.     Plaintiffs have been harmed by Google's anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. They have suffered and continue to suffer damages and irreparable injury, including harm to their businesses, and such damages and injury will not abate unless an injunction issues that will stop Google's anticompetitive conduct.

294.     In December 2023, the jury in *In re Google Play* found that Google unreasonably restrained trade in violation of the Cartwright Act for the reasons alleged herein in the global markets, excluding China, for Android app distribution and in-app billing services for digital goods and services transactions (*i.e.*, in-app payment processing). The jury similarly found that Google unlawfully tied the use of the Google Play Store to the use of Google Play Billing in violation of the Cartwright Act. That verdict acts as an estoppel and Plaintiffs' Cartwright Act claims may not be relitigated by Google.

**SEVENTH CAUSE OF ACTION: VIOLATION OF KOREA'S MONOPOLY REGULATION AND FAIR TRADE ACT**
**Plaintiffs KPA, KEPA, and PangSky on behalf of themselves,**
**the Korean App Developer Class, and the Korean Law Class**

295.     Plaintiffs KPA, KEPA, and PangSky incorporate by reference all the allegations above as if set forth herein in full.

296.     Plaintiff PangSky brings this claim on behalf of itself, the Korean App Developer Class, and the Korean Law Class defined above.

297.     Plaintiffs KPA and KEPA bring this claim on behalf of their Android-developer members that have sold and/or intend to sell Android apps and/or in-app products, the Korean App Developer Class, and the Korean Law Class defined above.

298.     The Korea Fair Trade Commission ("KFTC"), Korea's antitrust regulator has held that the relationship between Google LLC and Google Asia is sufficiently close and interlocking that each of these companies is responsible for the acts of the other for purposes of the KFTC's decision to sanction these entities' abuse of market dominance in the Android app market by excluding a third-party app store that attempted to open on Android OS devices.

299.    The Monopoly Regulation and Fair Trade Act ("MRFTA") is Korea's primary competition statute.

> The purpose of this Act is to prevent the abuse of market dominance by business entities and excessive concentration of economic power and to promote fair and free competition by regulating illegal cartel conduct and unfair trade practices, thereby encouraging creative business activities, protecting consumers, and promoting the balanced development of the national economy.

300.    The MRFTA applies to worldwide conduct that injures Korean-based companies.

301.    Google's conduct has injured, and continues to injure, Plaintiffs, because Google's conduct deprived them of revenue in Korea that they would have received if Google had not abused its market dominance and engaged in unfair trade practices in violation of the MRFTA.

302.    Under the MRFTA, Google is presumed to be a market-dominant business entity because its annual revenues exceed the statutory minimum and its market share exceeds 50% in the global markets, excluding China, for Android app distribution and in-app payment processing. Alternatively, Google is presumed to be a market-dominant business entity in smartphone app distribution services because Apple's App Store and Google's Play Store have a combined global market share of over 99% (excluding China) and Google's Play Store's 71% global market share (excluding China) exceeds the 10% minimum. Google is also presumed to be a market-dominant business entity for in-app purchases because Apple's App Store and Google's Play Store have a combined global market share of 96% (excluding China) and Google's Play Store's 38% global market share (excluding China) exceeds the 10% minimum. Similarly, Google is presumed to be a market-dominant business entity in smartphone operating systems because iPhone/iOS and Android have a combined global market share of over 99% (excluding China) and Android's 72% global market share (excluding China) exceeds the 10% minimum.

303.    In addition to the presumption of market dominance, Google is, in fact, a market-dominant business entity because it has monopoly power in the global market, excluding China, for Android app distribution and the global market, excluding China, for Android in-app payment processing.

304.    The KFTC has previously defined an Android based app market, excluding China in a corrective order issued to Google as a result of its finding that Google violated the MRFTA. That corrective order was affirmed by the Seoul High Court in a January 24, 2024 opinion (Case No. Nu 32995). That order acts as an estoppel that may not be relitigated by Google.

305.    Google's conduct, as alleged herein, violates the MRFTA's prohibition of abuse of market-dominant position and constitutes unfair trade practices in violation of the MRFTA because, among other things, Google's conduct violates the spirit and intent of the MRFTA. Additionally, Google's conduct is abusive and constitutes unfair trade practices (1) because it allows Google to unfairly exclude competition, (2) because it unfairly takes advantage of Google's bargaining position, and (3) because it unfairly restricts the business activities of Plaintiffs and other market participants.

306.    For example, Google has engaged in abusive business practices including, *inter alia*, unfairly determining and maintaining high commission rates in the markets for Android app distribution and in-app payment processing; unfairly controlling the provision of Android app distribution and in-app payment processing; unfairly interfering with the business activities of third-party payment providers for Android in-app payment processing; unfairly interfering with the ability of other entities seeking to provide app distribution services; and mandating restrictive agreements that allow it to maintain control over prices and exclude competition in the markets for Android app distribution and in-app payment processing, to the detriment of app developers, consumers, and competition.

307.    Furthermore, Google has engaged in unfair trade practices including, *inter alia*, unfairly excluding competitors in the markets for Android app distribution and Android in-app payment processing; unfairly taking advantage of its bargaining position in its agreements with app developers; forcing app developers to enter into restrictive agreements that limit competition and restricts app developers' ability to contract with other entities for the provisions of app distribution and in-app payment processing services; abusing its dominant position by demanding supracompetitive commission rates; dictating the price points at which app developers are allowed to

1   price apps; and demanding supracompetitive commission fees even when it allowed app developers

2   to use third-party in-app payment processing providers.

3       308.    In 2021, South Korea's legislature amended its Telecommunications Business Act to

4   permit developers of Android Apps to use alternative payment service providers for in-app products

5   purchased through South Korea's Google Play storefront. Google responded in or around November

6   2021 by imposing upon Android app developers a "commission" of 26% on the price paid by the user

7   through the alternative payment service provider.

8       309.    The Korea Communications Commission ("KCC") noted in 2023 its plan to impose a

9   47.5 billion won (~$32 million) fine on Google due to its violation of the Telecommunications

10  Business Act by forcing Korean developers to use Google's in-app billing system and unfairly

11  postponing evaluation of apps. The KCC found imposing the new 26% fees on Korean developers

12  constitutes a discriminatory act.

13      310.    On April 11, 2025, the KCC and the Korea Internet and Security Agency ("KISA")

14  announced the "2024 App Market Survey Result" under Article 22, Paragraph 9 (Obligations of App

15  Market Business Operators and Fact-Finding Surveys) of the Telecommunications Business Act.

16      311.    The KCC and KISA found that the key unfair practices Korean app developers

17  experience from app market operators like Google are "app review delays and registration rejections,

18  while the biggest problem with in-app purchases they perceive is excessive commission fees."

19      312.    According to 70.4% of Korean developers, the biggest problem with in-app purchases

20  was excessive commission fees, followed by unclear payments, including refunds and limited

21  payment options.

22      313.    Other issues cited by developers that occurred during the initial app registration

23  process include unclear review standards and delayed feedback on inquiries.

24      314.    Plaintiffs have been injured by Google's conduct and are therefore entitled to an award

25  of damages under the MRFTA.

26      315.    Plaintiffs have been injured, and will continue to be injured, in their businesses and

27  property as a result of Google's conduct, including because Google charges a supracompetitive

28

1  commission for Android app distribution and in-app payment processing that it would not otherwise

2  receive in a competitive market. As such, members of the Korean App Developer Class and the

3  Korean Law Class are entitled to an injunction to prevent Google from continuing to engage in

4  abusive and unfair trade practices as alleged herein.

**EIGHTH CAUSE OF ACTION: ACT ON PROHIBITION OF PRIVATE
MONOPOLIZATION AND MAINTENANCE OF FAIR TRADE (Act No. 54 of April 14,
1947) AND THE MOBILE SOFTWARE COMPETITION ACT
Plaintiff OverX, on behalf of itself, the Japanese Law Class, and the Japanese App Developer
Class**

8  316.    Plaintiff OverX incorporates by reference all the allegations above as if set forth

9  herein in full.

10  317.    Plaintiff OverX brings this claim for injunctive relief on behalf of itself, the Japanese

11  Law Class, and the Japanese App Developer Class defined above.

12  318.    For this Count, the fields of trade are the global markets, excluding China, for Android

13  app distribution and in-app payment processing.

14  319.    Non-Android app distribution and payment processing services are incompatible with,

15  and are not substitutes for, Android app distribution and in-app payment processing. For the reasons

16  stated herein, substantial barriers to entry and expansion exist in the markets for Android app

17  distribution and in-app payment processing.

18  320.    The AMA is Japan's primary antitrust statute. Article 1 of the AMA states:

> The purpose of this Act is to promote fair and free competition,
> stimulate the creative initiative of enterprise, encourage business
> activity, heighten the level of employment and actual national income,
> and thereby promote the democratic and wholesome development of
> the national economy as well as secure the interests of general
> consumers by prohibiting private monopolization, unreasonable
> restraint of trade and unfair trade practices, preventing excessive
> concentration of economic power and eliminating unreasonable
> restraints on production, sale, price, technology, etc. , and all other
> unjust restrictions on business activity through combinations,
> agreements, etc.

25  321.    The AMA applies to worldwide conduct that injures Japanese-based companies, thus

26  affecting the Japanese market.

322.    Google's conduct has injured, and continues to injure, OverX and members of the Japanese Law Class and Japanese App Developer Class because Google's conduct deprived them of revenue that they would have received, and competitive alternatives that would have been available, if Google had not violated the AMA.

323.    Exclusionary private monopolization means "business activities, by which any enterprise, individually or by combination, in conspiracy with other enterprises, or by any other manner, excludes or controls the business activities of other enterprises, thereby causing, contrary to the public interest, a substantial restraint of competition in any particular field of trade."

324.    Google has obtained and maintained 100% or nearly 100% market share in Android app distribution and Android in-app payment processing markets globally, excluding China.

325.    As the Japan Fair Trade Commission ("JFTC") found in its 2023 study on mobile OS and mobile app distribution, "Google's Android and Apple's iOS account for nearly 100% of the mobile OS on smartphones sold in Japan. Consequently, the choice of mobile ecosystem for consumers in Japan is limited to the following two: a mobile ecosystem centered on Android ('Android Ecosystem') and that of iOS ('iOS Ecosystem')."

326.    The JFTC "found that there is limited competitive pressure" on Android and iOS because "[f]or consumers, the lock-in effects between Android and iOS make it difficult to switch between ecosystems," "[g]iven the indirect network effects, other mobile OSs will need to acquire a sufficient number of both consumers and app developers in order to sustainably compete with Android and iOS," and because "tablets, PCs and other devices are used together with smartphones and are not meant to be a replacement for smartphones."

327.    The JFTC also noted that, according to a consumer survey, 96.8% of Android users said their previous smartphone was an Android and 88.1% of iOS users said their previous smartphone was an iPhone.  It further found that "only 3.4% of iOS users and 5.8% of Android users said they would purchase a smartphone with a different OS if the price of smartphones (or apps) with the mobile OS they chose rises by 5-10%." As such, the JFTC concluded that "there is a lock-in effect

1  in both of the Android ecosystem and the iOS ecosystem, making it difficult to switch between these

2  ecosystems."

3      328.    The JFTC elaborated that "consumers are locked-in to the mobile OS they are

4  currently using" because consumers incur many different costs if they switch their mobile OS,

5  including financial costs, learning costs, and other costs such as "apps will be unavailable or difficult

6  to use when switching to a different OS," "switching OS takes time and effort to transfer data,"

7  "switching to a different OS makes it impossible or difficult to use already purchased contents," and

8  "switching OS would be inconvenient since the current OS is the same with family and friends."

9      329.    With regards to app distribution, the JFTC found that there do not appear "to be

10  effective competitive pressures" on Google's Play Store and Apple's App Store.

11     330.    In addition, Google has market power in the global Smartphone OS market for reasons

12  set forth herein and as further reflected in the following chart:





331.     Google has engaged in exclusionary private monopolization in the Android app distribution and in-app payment processing markets. Google has controlled and excluded the business activities of Android app developers through its MADA agreements with OEMs that require preinstallation and favorable placement of the Google Play Store on Android devices to the exclusion of competitor app stores; through its RSA agreements with OEMs that foreclose OEMs' ability to preinstall any app store other than the Google Play Store; through RSA agreements with large app developers to dissuade them from competing with the Google Play Store; through its adhesive DDAs and related policies that demand supracompetitive commission rates, require the use of Google Play Billing, and tie the use of distribution services for Google Play to Google Play Billing; and through implementing technical restrictions and barriers to dissuade sideloading and the use of alternative payment processing services. Google's conduct has foreclosed competition in Android app distribution and in-app payment processing services, to the detriment of Android app developers and consumers.

332.     Google has also engaged in unfair trade practices in violation of the AMA. Google, *inter alia*, charges supracompetitive commissions for Android app distribution and in-app payment processing; restricts Android app developers' ability to distribute Android apps through methods other than the Google Play Store; restricts Android app developers' ability to utilize third-party payment processing services; and uses its superior bargaining position to unjustly demand high commissions and restrict competitive alternatives to the Google Play Store and Google Play Billing.

333.     Google further violated the AMA by conditioning its provision of Android app distribution services on developers' exclusive use of Google Play Billing.

334.     Google similarly violated the AMA by engaging in exclusive dealing arrangements dictating that Japanese Android app developers only use Google Play Billing to process payments, to the exclusion of competition.

335.     In its 2023 study on mobile OS and mobile app distribution, the JFTC found that Google's high commissions lead to higher-priced digital content and interfere with transactions between Google's competitors and consumers, "causing a decrease in trade opportunities for the

competitors or the exclusion of the competitors." It also took issue with Google's superior bargaining position with app developers to unilaterally set excessively high commission rates that unjustly disadvantage app developers. The JFTC noted that Google's conduct "would be a problem under the AMA (Private monopolization, Interference with a competitor's transactions, Abuse of a superior bargaining position, etc.)." And it explained that "there is not sufficient competitive pressure on the app distribution in the app stores provided by Google and Apple, so the level of app store commission cannot be expected to decline by market functions."

336.    As of July 29, 2025, Japan's Mobile Software Competition Act ("MSCA") clarifies that large providers of mobile device software, like Google, may not restrict the installation of third-party app stores and they may not restrict the use of alternative payment methods for apps or in-app purchases. Further, large providers of mobile device software, including Google, may not engage in conduct designed to hinder competition from third-party app stores, including through the use of licensing agreements, and other terms of use and/or technical specifications. And, large providers of mobile device software, including Google, may not engage in conduct designed to hinder the use of alternative payment methods for apps or in-app purchases. Specifically, large providers of mobile device software, including Google, are prohibited from imposing fees that hinder the use of alternative payment methods by users and developers. Google has no "justifiable reasons" that would allow it to maintain its current restrictions concerning third-party app stores and alternative payment methods, which have violated the AMA and now violate the MSCA as well.

337.    The JFTC recognizes that violations of the MSCA are violations of the AMA.

338.    OverX and members of the Japanese Law Class and Japanese App Developer Class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including because Google charges a supracompetitive commission for the distribution and sale of Android apps and in-app products that it would not otherwise receive in a competitive market. As such, OverX and members of the Japanese Law Class and Japanese App Developer Class are entitled to an injunction to prevent Google from continuing its violations of the AMA and MSCA.

**NINTH CAUSE OF ACTION: JAPAN CIVIL CODE, ARTICLE 709 (Act No. 89 of April 27, 1896)**
**Plaintiff OverX, on behalf of itself,**
**the Japanese Law Class, and the Japanese App Developer Class**

339.    Plaintiff OverX incorporates by reference all the allegations above as if set forth herein in full.

340.    Plaintiff OverX brings this claim for monetary relief on behalf of itself, the Japanese Law Class, and the Japanese App Developer Class defined above.

341.    For this Count, the fields of trade are the global markets, excluding China, for Android app distribution and in-app payment processing.

342.    Pursuant to Japan's Civil Code, "[a] person that has intentionally or negligently infringed the rights or legally protected interests of another person is liable to compensate for damage resulting in consequence."

343.    Google's violation of the AMA and the MSCA constitutes a violation of Japan's Civil Code as its conduct infringed the rights or legally protected interests of Japanese Android app developers as explained herein.

344.    Google has intentionally or negligently restricted Android app developers' ability to distribute Android Apps through distribution methods other than the Google Play Store and extracted supracompetitive commissions. Google has also intentionally or negligently restricted Android app developers' ability to utilize payment processing methods other than Google Play Billing.

345.    Google's conduct as alleged herein caused harm to Android app developers' interests, including paying supracompetitive commissions, causing lower sales, and reducing choice and innovation.

346.    OverX and members of the Japanese Law Class and Japanese App Developer Class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including because Google charges a supracompetitive commission for the distribution and sale of Android apps and in-app products that it would not otherwise receive in a competitive market. As such, OverX and members of the Japanese Law Class and Japanese App Developer Class are entitled to damages stemming from Google's violations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Classes defined herein, by adjudging and decreeing as follows:

     A. This action may proceed as a class action, with Plaintiffs serving as the representatives of the Classes and their counsel serving as Class Counsel for each of the Classes;

     B. Defendants have engaged in anticompetitive conduct in violation of Sections 1, 2 and 3 of the Sherman Act (15 U.S.C. §§ 1, 2, 3), and that Plaintiffs and the members of the Classes have been injured in their business and property as a result of Defendants' violations;

     C. Plaintiffs and the members of the Classes recover damages and/or restitution as provided by the federal antitrust laws, California's UCL, California Cartwright Act, Korea's Monopoly Regulation & Fair Trade Act, Japan's Civil Code, and that a judgment in favor of Plaintiffs and the Classes be entered against Defendants in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

     D. Plaintiffs and the members of the Classes recover restitutionary relief to the extent such relief is afforded by any of the aforementioned laws;

     E. Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the anticompetitive conduct alleged herein;

     F. Plaintiff and members of the Classes be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

     G. Plaintiffs and members of the Classes recover their costs of this suit, including reasonable attorneys' fees as provided by law;

     H. Plaintiffs and members of the Classes are entitled to injunctive relief suitable to remedy Defendants' past and ongoing restraint of trade, including the following:

i.   A judicial determination declaring the rights of Plaintiffs and the Classes, and the corresponding responsibilities of Defendants; and

ii.  Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein,

I.   Defendants are to be responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification of this action and their rights to the Class members;

J.   That the Court award Plaintiffs declaratory relief, adjudging Google's complained-of practices to be unlawful; and

K.   Plaintiffs and members of the Classes receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

DATED: November 4, 2025

Respectfully submitted,

By: /s/ *Kyle G. Bates*
Kyle G. Bates (SBN 299114)
Scott Martin (*Pro Hac Vice*)
Yixi "Cecilia" Cheng (SBN 325216)
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
kbates@hausfeld.com
smartin@hausfeld.com
ccheng@hausfeld.com

*Counsel for Plaintiffs and the putative Classes*

YoungKi Rhee (*Pro Hac Vice*)
WE THE PEOPLE LAW GROUP
Chinyang Building, 7/F
47 Kyonggidae-ro, Seodaemun-gu
Seoul, South Korea 03752
Telephone: 82-2-2285-0062
ykrhee@wethepeople.co.kr

*Counsel for PangSky and the putative Classes*

Christopher L. Lebsock (SBN 184546)
Michael P. Lehmann (SBN 77152)
Samuel Maida (SBN 333835)
HAUSFELD LLP
580 California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
clebsock@hausfeld.com
mlehmann@hausfeld.com
smaida@hausfeld.com

Ida Abhari (SBN 346569)
HAUSFELD LLP
1200 17th Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
iabhari@hausfeld.com

*Counsel for Plaintiffs and the putative Classes*

Byung-Joo Lee (SBN 225384)
JIHYANG LAW FIRM
Seohee Tower, 7/F
2583 Nambusunhwan-ro
Seoul, Korea 06735
Telephone: 82-2-3476-6002
Facsimile: 82-2-3476-6607
bjlee@jihyanglaw.com

*Counsel for KPA, KEPA, OverX and the putative Classes*